# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ASSUREDPARTNERS OF )
VIRGINIA, LLC, )
                Plaintiff, )
      v. ) C.A. No. N19C-02-175 AML CCLD
 )
WILLIAM PATRICK SHEEHAN, )
SIG HOLDINGS, INC., )
MATTHEW A. LEE, KDW )
FINANCIAL, INC., MARK )
JOSEPH SHEEHAN, and )
BRIANNA COUGHLIN, )
 )
           Defendants. )

**Submitted: February 21, 2020**
**Decided: May 29, 2020**

## MEMORANDUM OPINION

**Upon Defendants' Motion to Dismiss: Granted in Part, Denied in Part**

**Attorneys and Law Firms**

Gregory P. Williams, Esquire, Blake Rohrbacher, Esquire, Matthew D. Perri, Esquire, and Kevin M. Regan, Esquire, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, Joseph G. Santoro, Esquire, and Roger W. Feicht, Esquire, of GUNSTER, West Palm Beach, Florida, Attorneys for Plaintiff AssuredPartners of Virginia, LLC.

Martin S. Lessner, Esquire, Lauren Dunkle Fortunato, Esquire, and Kevin P. Rickert, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, Attorneys for Defendants William Patrick Sheehan, SIG Holdings, Inc., Matthew A. Lee, KDW Financial, Inc., Mark Joseph Sheehan, and Brianna Coughlin.

LEGROW, J.

This breach of contract action arises out of the sale of Sheehan Insurance, Inc. to buyer, the plaintiff in this action, pursuant to an asset purchase agreement executed on December 11, 2014. After the sale, the sellers continued to run the business's day-to-day operations. The agreement established a specific structure for the business's post-closing operations and imposed several pre-closing disclosure obligations on the sellers, who are among the defendants in this action. To complete the transaction, the parties also entered into an earn-out agreement, an employment agreement calling for one of the sellers' continued employment with the company, a limited partnership agreement, and an equity incentive plan.

Four years later, buyer initiated this action against sellers with a complaint alleging breaches of the asset purchase agreement's representations and warranties. Buyer further claims the sellers fraudulently concealed material facts with the goal of making Sheehan Insurance, Inc. look more attractive and valuable than it was, resulting in an inflated purchase price for Sheehan Insurance Inc.'s assets. In particular, the sellers are alleged to have concealed liabilities and misrepresented that the disclosed pay arrangements with its then-current employees were true and accurate and that the financial statements provided also were true and accurate.

Sellers moved to dismiss all counts in the operative complaint as untimely and for failure to state a claim. For the reasons explained below, I conclude the action cannot be dismissed as untimely at this stage of the litigation, but I dismiss the

1

sellers' fraudulent inducement and civil conspiracy claims for failure to state a claim. As for the remaining claims, Counts I, II, and V survive under the minimal pleading standard applicable to a motion to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the second amended complaint and the documents it incorporates. On December 11, 2014, Plaintiff, AssuredPartners of Virginia, LLC ("AssuredPartners"), entered into an asset purchase agreement ("APA"), whereby the assets of Sheehan Insurance Service, Inc. ("Sheehan Insurance") were sold to AssuredPartners (the "Transaction").[1] Under the APA, AssuredPartners paid over $14 million for Sheehan Insurance's assets.[2] Anticipating William Patrick Sheehan ("Pat") and Sheehan Insurance (collectively, the "Sellers") would continue to run the business after closing, the APA established a specific structure for the post-closing operations and imposed several pre-closing disclosure obligations and post-closing operational obligations on the Sellers.[3]

Before completing the Transaction, the parties engaged in due diligence.[4] During that process, the Sellers were obligated to disclose certain information about

---

[1] Second Amended Complaint ("SAC") ¶ 3.
[2] *Id*. ¶ 22.
[3] *Id*. ¶ 23. The Court uses certain parties' first names for clarity. No disrespect is intended.
[4] *Id*. ¶ 5.

2

the business to AssuredPartners,[5] including details about the business's financials, revenue, profit margins, and liabilities, as well as employee head count and pay arrangements.[6]

## A. The APA

The APA, which sets forth the terms and conditions of Sellers' sale of Sheehan Insurance to AssuredPartners, contains several provisions essential to the parties' dispute.

Section 2.06(c) of the APA defines the earn-out the sellers could receive and how and when that amount would be calculated:

> Within ninety (90) days after the end of the Earn-Out Period, Buyer shall calculate the Earn-Out Amount and deliver to Seller a statement (the "Earn-Out Statement") setting forth such calculation with reasonable supporting documentation. The Earn-Out Statement shall be deemed accepted by the Seller Parties and shall be conclusive for purposes of determining the Earn-Out Amount unless Seller delivers to Buyer written notice specifying Seller's objections to the Earn-Out Statement in reasonable detail within thirty (30) days of Seller's receipt of the Earn-Out Statement (the "Earn-Out Objection Notice").[7]

Article 4 of the APA contains representations and warranties that the Sellers jointly and severally made to AssuredPartners.[8] APA Sections 4.12, 4.13, 4.15, 4.20, 4.23, 4.25, 4.26, and 4.33 are relevant to the Counts in the second amended

---

[5] *Id.*
[6] *Id.*
[7] SAC Ex. A § 2.06(c) (hereinafter "APA").
[8] APA, Art. 4.

complaint. In Section 4.12, the Sellers specifically represented and warranted that Sheehan Insurance's financial statements that were provided to AssuredPartners "fairly present, in all material respects, the financial condition and the results of operations, changes in shareholders' equity and cash flows of Seller as at the respective dates of and for the periods referred to in such Financial Statements."[9] In Section 4.13, the Sellers represented and warranted that there were no undisclosed "[l]iabilities or obligations of a material nature, whether absolute, accrued, contingent or otherwise, or whether due or to become due … required by GAAP to be disclosed on a balance sheet."[10]

Section 4.15 warranted the completeness and accuracy of the books and records:

> The books of account, minute books, equity interest records, and other records of Seller, all of which have been made available to Buyer, have been maintained in accordance with commercially reasonable business practices, consistently applied, and fairly and accurately provide the basis for the financial position and results of operations of Seller set forth in the Financial Statements. The minute books of Seller reflect all material actions taken by the board of directors and the shareholders of Seller since its incorporation or organization. [11]

Section 4.20 represented that all material contracts had been disclosed:

> Schedule 4.20 lists all Material Seller Contracts (whether written or oral). Seller has delivered to Buyer a true, correct and complete copy of

---

[9] *Id.* § 4.12.
[10] *Id.* § 4.13.
[11] *Id.* § 4.15.

4

each Material Seller Contract (as amended to date) (or a summary thereof in the case of an oral Contract).[12]

Section 4.23 provided that "Schedule 4.23 contains a complete and accurate list of the following information for each employee or director of Seller, including each employee on leave of absence or not actively at work or layoff status: … salary or other measure of Compensation …."[13]

Section 4.25 represented there were no "Affiliate Transactions":

> Other than as set forth on Schedule 4.25, no current or former officer, director, shareholder, employee, or partner of Seller, or any of its respective Affiliates, or any individual related by blood, marriage, or adoption to any such individual, or any entity in which any such Person or individual owns any beneficial interest (a) is now a party to any Contract or transaction with Seller … or (c) receives income from any source which should properly accrue to Seller. Seller is not a guarantor or otherwise liable for any actual or potential Liability, whether direct or indirect, of any of its Affiliates.[14]

The APA defined "Affiliate" as "with respect to a particular Person, another Person who controls, is controlled by or is under common control with the Person in question."[15]

Section 4.26 provided "[a]ll employee bonuses, profit sharing, vacation and sick time and any other bonus or employee compensation or incentive plan

---

[12] *Id.* § 4.20. Section 1.45 defines Material Seller Contracts as referring to "each Contract relating to the Business to which Seller is a party." *Id.* § 1.45.
[13] *Id.* § 4.23.
[14] *Id.* § 4.25.
[15] *Id.* § 1.06.

obligations are properly reflected in the Financial Statements."[16] Section 4.12 represented that "[t]he Financial Statements have been prepared from and are in accordance with the accounting Records of Seller."[17]

Section 4.33 represented that there were no material misstatements or omissions in the APA or its schedules:

> To the Knowledge of any Seller Party, the information concerning Seller set forth in this Agreement, Schedules to this Agreement and any document to be delivered by any Seller Party at the Closing to Buyer pursuant hereto, does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein or therein, in light of the circumstances in which they are made, not false or misleading.[18]

Section 6.11 prohibited the Sellers from making unauthorized post-closing payments of "bonus, compensation, or other remuneration to any employee of Buyer or its subsidiaries or Affiliates," if such payments are "conditioned upon, or in any way related to, such employee's performance or employment with Buyer or its subsidiaries or Affiliates during the Earn-Out Period or otherwise."[19]

Finally, Section 7.01 (the "Survival Clause") provided that the representations and warranties contained in Articles IV and V shall survive "two (2) years after the Closing Date."[20] Section 7.01(c) contains an exception for "fraudulently given"

---

[16] *Id.* §4.26.
[17] *Id.* §4.12.
[18] *Id.* § 4.33.
[19] *Id.* § 6.11.
[20] *Id.* § 7.01

representations and warranties, which "shall survive the Closing Date until sixty (60) days after the expiration of the applicable statute of limitations."[21]

## B. The KDW Agreement

After closing, AssuredPartners relied on Pat, Defendant Mark Joseph Sheehan ("Mark"), and Defendant Matthew A. Lee ("Mr. Lee") to run the business's day-to-day operations.[22] Before the Transaction, Mr. Lee worked for Sheehan Insurance as its chief financial officer.[23] After closing, he provided accounting services for Pat and Sheehan Insurance's benefit, and at AssuredPartners' expense, through his company, KDW Financial Corporation ("KDW Financial").[24] AssuredPartners entered into an Independent Contractor Agreement with KDW Financial (the "KDW Agreement") and Mr. Lee.[25]

Under that agreement, KDW Financial agreed to "provide accounting, operational and administrative services and support for [AssuredPartners'] insurance-brokerage business in Haymarket, Virginia […] through [Mr. Lee]…."[26] Mr. Lee and KDW Financial also "each covenant[ed] and agree[d] that the Services will be provided diligently and in good faith and in a manner substantially consistent

---

[21] *Id.* § 7.01(c).
[22] SAC ¶ 4.
[23] *Id.* ¶ 12.
[24] *Id.*
[25] *Id.* ¶ 13.
[26] *Id.* ¶ 87; Ex. B (hereinafter, "KDW Agreement") at ¶ 1.

with [Mr. Lee]'s past practice in performing the same or similar services...."[27] Mr. Lee and KDW Financial also agreed to provide all services "in accordance with all applicable statutes, laws, and regulations, all policies and procedures established by [AssuredPartners] from time to time, all rules of ethics applicable to members of the insurance profession, and in accordance with the appropriate standard of care."[28]

## C. AssuredPartners makes certain discoveries after closing.

Following the closing, AssuredPartners contends that it discovered several of the Sellers' representations and warranties were false and that Pat, Mark, and Lee breached their post-closing obligations.

### 1. Pre-closing representations and warranties

AssuredPartners claims the Sellers knew of material information relevant to Sheehan Insurance's value but failed to disclose it to AssuredPartners before closing. Specifically, AssuredPartners alleges that the Sellers knew the following representations were false or were made with reckless indifference to their truth: (i) that there were no undisclosed liabilities, (ii) that all material contracts and future compensation owed to Sheehan Insurance employees had been disclosed, (iii) that all Affiliate Transactions had been disclosed, and (iv) that all compensation owed to Sheehan Insurance employees had been paid or would be paid before closing.[29]

---

[27] SAC ¶ 88; KDW Agreement at ¶ 1.
[28] SAC ¶ 89; KDW Agreement at ¶ 8.3.
[29] SAC ¶ 72.

First, AssuredPartners argues that the Sellers failed to disclose a liability to Defendant Brianna Coughlin ("Ms. Coughlin"). Ms. Coughlin is Pat's wife and was a leading sales producer for Sheehan Insurance before AssuredPartners acquired the business.[30] The revenue generated by Ms. Coughlin's "book of business" represented over twenty percent of Sheehan Insurance's total revenue.[31] At the time of closing, Ms. Coughlin earned a salary of $241,777.00 from Sheehan Insurance. After closing, Ms. Coughlin became an AssuredPartners employee.[32] Pat did not disclose to AssuredPartners that he was married to Ms. Coughlin.[33]

AssuredPartners contends Ms. Coughlin was paid hundreds of thousands of dollars of "compensation" after closing based on secret agreements between Pat, Mark, Mr. Lee and Ms. Coughlin.[34] Mr. Lee, Mark, and Ms. Coughlin each worked closely with Pat for years before closing and therefore were aware of the APA and the impending closing.[35] The APA explicitly is mentioned in each of their respective Employment/Consulting Agreements with AssuredPartners, which were made "[i]n connection with, and conditioned upon the closing of, the Acquisition."[36]

---

[30] *Id.* ¶ 15.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.* ¶ 31.
[35] *Id.* ¶ 17.
[36] *Id.*

9

Before closing, Pat, Mark, and Mr. Lee signed three agreements (the "Coughlin Guarantees") personally guaranteeing that certain minimum payments would be made to Ms. Coughlin after the Transaction closed.[37] The three Coughlin Guarantees were signed on December 9, 2014, the day the Sellers signed the APA.[38] One of the Coughlin Guarantees was for a "previously owed commission," plus commissions through a period beginning before and ending after the closing.[39] The two other Coughlin Guarantees promised that certain amounts would be paid in the future "as part of her compensation plan."[40]

AssuredPartners alleges the Coughlin Guarantees were personal promises to pay Ms. Coughlin if Sheehan Insurance failed to do so.[41] One of these Coughlin Guarantees specifically referenced "the final earn out calculation" and discussed payments "depending on the final earn out."[42] Another of the Coughlin Guarantees also referenced the "earn out," but that portion appears to have been struck out.[43] In total, the three Coughlin Guarantees awarded Ms. Coughlin over $1.1 million in guaranteed compensation that was not disclosed to AssuredPartners.[44] Ms. Coughlin

[37] *Id.* ¶¶ 26-27.
[38] *Id.* ¶ 28.
[39] *Id.*
[40] *Id.* ¶ 29.
[41] *Id.*
[42] *Id.*, Ex. C (hereinafter, Coughlin Guarantees) at 4.
[43] Coughlin Guarantees at 2.
[44] SAC ¶ 45.

ultimately left AssuredPartners on August 1, 2017, less than five months after the earn-out payment was made.[45]

AssuredPartners also alleges the Defendants failed to disclose a $139,000.00 liability to Bob Stravinski, a sales producer for Sheehan Insurance and its fourth-highest paid employee. This liability was incurred pre-closing and paid post-closing, but was not reported in the income statement.[46]

## 2. Post-closing performance

AssuredPartners avers that Defendants misrepresented Sheehan Insurance's post-closing performance. After closing, Pat, Mark, and Ms. Coughlin became AssuredPartners employees.[47] AssuredPartners alleges these misrepresentations were intended to inflate the earn-out due under the APA. That earn-out was based on the business achieving certain EBITDA performance targets in the two years following the acquisition.[48] AssuredPartners alleges that Mr. Lee and KDW Financial facilitated these post-closing misrepresentations by manipulating financial statements and records to misrepresent AssuredPartners' post-closing EBITDA.[49] Moreover, Mr. Lee and KDW Financial purportedly failed to properly record the Coughlin Guarantees as a liability on the business's financial statements.[50]

---

[45] *Id.* ¶ 16.
[46] *Id.* ¶ 32.
[47] *Id.*
[48] *Id.*
[49] *Id.* ¶ 90.
[50] *Id.* ¶ 91.

AssuredPartners alleges the false and misleading financial statements provided by the Sellers, Mr. Lee, and KDW Financial artificially inflated EBITDA and, as a result, the Sellers received the maximum earn-out payment, a total of over $4 million.[51]

### 3. Post-closing payments

AssuredPartners claims it has discovered evidence showing over $1 million of improper payments to Ms. Coughlin and Bob Stravinski.[52] The APA prohibited the Sellers from making any payments to employees after closing without AssuredPartners' written authorization.[53] The second amended complaint alleges Pat and Sheehan Insurance did not seek the required authorization from AssuredPartners and instead made the payments secretly.[54] AssuredPartners further alleges Mark and Pat improperly made payments to Mr. Lee after they were directed to stop using KDW Financial's services, and that Mark and Pat falsified expense reimbursements to hide these unauthorized payments.[55]

## D. Defendants' alleged fraudulent concealment of their wrongdoing.

AssuredPartners contends that Defendants concealed material information both before and after closing. First, Defendants allegedly waited to sign the

---

[51] *Id.*
[52] *Id.* ¶ 37.
[53] *Id.* ¶ 36.
[54] *Id.* ¶¶ 37-38.
[55] *Id.* ¶¶ 38-39.

Coughlin Guarantees until December 9, 2014, the day before closing, in furtherance of a post-closing scheme to make "off the books" payments through Sheehan Insurance to avoid the expenses properly being reported to AssuredPartners.[56] Second, AssuredPartners avers that Pat, Mr. Lee, and KDW Financial fraudulently concealed various improper payments after closing by not recording transactions within the financial statements submitted to AssuredPartners and by using misleading descriptions for payments within the business's account management software.[57] AssuredPartners alleges that Defendants conspired to conceal the Coughlin Guarantees from AssuredPartners, representing over $1.1 million in unjustified and undisclosed payments that Pat caused to be paid post-closing through the misappropriation of funds from AssuredPartners.[58]

Because of Defendants' concealment, AssuredPartners claims it did not discover the unauthorized payments to KDW Financial until 2018.[59] This triggered an internal investigation by AssuredPartners that led to the discovery of additional facts and, ultimately, to Mark's and Pat's termination "with cause."[60] Because of Defendants' concealment, AssuredPartners alleges it did not discover the Coughlin Guarantees until January 2019.

---

[56] *Id.* ¶ 42.
[57] *Id.* ¶ 46.
[58] *Id.* ¶ 45.
[59] *Id.* ¶ 47.
[60] *Id.*

Pat, through his agents Mr. Lee, KDW Financial, and Ryan Henson, submitted regular financial records to AssuredPartners regarding the business's post-closing operations. AssuredPartners alleges those financial records omitted the liabilities owed to Ms. Coughlin and Bob Stravinski and omitted the associated expenses when those payments ultimately were made in 2015, 2016, and 2017.[61] Because Pat retained full control over Sheehan Insurance's existing bank accounts with BB&T after closing, these post-closing payments were made "off the books" without AssuredPartners' knowledge.[62]

## E. Procedural background

On February 19, 2019, AssuredPartners filed a complaint in this Court's Complex Commercial Litigation Division against Pat, Mark, Sig Holdings, Inc. ("Sig") (f/k/a Sheehan Insurance Service, Inc.), Mr. Lee, KDW Financial, and Ms. Coughlin (collectively, "Defendants") for breach of contract, breach of the implied covenant, fraudulent inducement, civil conspiracy, and indemnification (the "Superior Court Action").

On April 15, 2019, Defendants filed purported counterclaims without an answer, along with a motion to transfer the Superior Court Action to the Court of Chancery under 10 *Del. C.* § 1902 on the basis of those counterclaims. On May 3,

---

[61] *Id.*
[62] *Id.*

2019, Mark and Pat filed a complaint against AssuredPartners in the Court of Chancery concerning the termination of their employment with AssuredPartners (the "Court of Chancery Action").[63] On June 10, 2019, this Court denied the motion to transfer because the purported counterclaims, unaccompanied by an answer, were not a proper pleading. By order dated June 13, 2019, the Delaware Supreme Court designated this judge to hear the Court of Chancery Action so that one judicial officer could resolve the parties' overlapping and related disputes.

AssuredPartners has amended its complaint twice. The second amended complaint asserts five counts. Count I alleges the Sellers breached the APA, while Count II alleges the Sellers breached the implied covenant of good faith and fair dealing. Count III alleges the Sellers fraudulently induced AssuredPartners to close the Transaction. Count IV alleges a civil conspiracy claim against the Sellers, Mark, Mr. Lee, and Ms. Coughlin. Count V alleges a claim for contractual indemnification against Mr. Lee and KDW Financial.

The Court heard arguments on motions to dismiss in the Court of Chancery Action and the Superior Court Action on February 10, 2020 (the "February 10, 2020 Hearing"). This court took the motions to dismiss under advisement after the hearing.

---

[63] *See* C.A. 2019-0333-AML.

**F. The parties' contentions**

Defendants argue that all five counts (1) violate the contractual limitations period, (2) are barred by the contractual limitations period, and (3) fail to state a claim. Defendants contend that tolling does not apply to the contractual limitations period because the APA adopts the statutory limitations period without allowing for tolling. Even if tolling does apply, Defendants contend AssuredPartners has not adequately pleaded tolling.

AssuredPartners argues that the claims were tolled by Defendants' fraudulent concealment. AssuredPartners asserts the second amended complaint alleges Sheehan Insurance and Pat Sheehan fraudulently concealed material facts from AssuredPartners, preventing AssuredPartners from discovering those facts during the limitations period. AssuredPartners also argues the second amended complaint adequately alleges claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, civil conspiracy, and contractual indemnification.

## ANALYSIS

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would

16

not be entitled to recover under any reasonably conceivable set of circumstances.[64]

The Court, however, must "ignore conclusory allegations that lack specific supporting factual allegations."[65]

## A. Count I adequately pleads a breach of contract claim.

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages."[66] Defendants contend the Second Amended Complaint fails adequately to plead the requisite elements of contractual breach for the following reasons: (i) Pat did not owe an obligation under Article IV because he is not the "Seller" as defined by the APA; (ii) Sheehan Insurance did not breach any obligation under Article IV because the Coughlin Guarantees only were made in Pat's personal capacity; and (iii) the alleged improper payments to Ms. Coughlin, Mr. Lee, KDW Financial, and Bob Stravinski did not breach any obligation because Section 6.11 did not require disclosure of those payments.

First, Defendants argue Pat did not owe an obligation because "[t]he vast majority of the APA Sections that AssuredPartners alleges Sheehan Insurance and Pat to have breached refer to representations and warranties as to the liabilities of

---

[64] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

[65] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).

[66] *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super.), *aff'd*, 886 A.2d 1278 (Del. 2005) (internal citation omitted).

the "Seller," not of Pat, as an individual."[67]  In particular, Defendants contend "[t]he representations in Article IV are almost exclusively as to the completeness and accuracy of the disclosures and records of the Seller (Sheehan Insurance)."[68]  Article IV is titled "Representations and Warranties of the *Seller Parties*."[69]  The first sentence of Article IV states that "[t]he *Seller Parties* jointly and severally represent and warrant to Buyer as follows[.]"[70]  The APA's first paragraph defines "Seller Parties" as Pat Sheehan *and* Sheehan Insurance.[71]  Therefore, under the APA's plain language, Sheehan Insurance and Pat both are liable for Article IV's representations and warranties.

Second, Defendants argue Sheehan Insurance did not breach the APA because "Sheehan Insurance is not a party to the [Coughlin Guarantees], is not mentioned in the [Coughlin Guarantees], and no part of the [Coughlin Guarantees] states that payments are conditioned on Sheehan Insurance's failure to make a payment."[72]  It is undisputed that the Coughlin Guarantees fail to mention Sheehan Insurance.[73]  The main issue before this Court is whether the phrase "personally guarantees…as part

---

[67] Defs.' Op. Br. in Supp. of Mot. to Dismiss (hereinafter, "Defs. Mot.") at 19.
[68] *Id*. at 5. (citing APA §§ 4.12; 4.20; 4.23; 4.25; 4.26).
[69] APA at 17 (emphasis added).
[70] *Id*. (emphasis added).
[71] *See id*. at 2 (emphasis added).
[72] Reply Br. in Further Supp. of Defs. Mot. at 11.
[73] *See generally* Coughlin Guarantees.

of her compensation plan" implies an underlying obligation on the part of Sheehan Insurance.

Defendants contend Pat's personal guarantees do not imply the existence of an underlying obligation owed by Sheehan Insurance. "Personal guarantee" typically is defined as "[a]n arrangement in which a person becomes liable for the debts of another party, in case the other party fails to clear their dues on time."[74] Defendants, however, attempt to invoke a different definition, arguing "guarantee" means "something given or existing as security such as to fulfill a future engagement or condition subsequent."[75] According to Defendants, "[t]he [Coughlin Guarantees] are guarantees existing as securities—personal promises of payment to be redeemed at a later date."[76] Defendants' interpretation of "personal guarantee" cannot be reconciled with the Coughlin Guarantees' unambiguous language. The Coughlin Guarantees recognize that Sheehan Insurance owed Ms. Coughlin a liability "as part of her compensation plan" and that Pat, Mark, and, in some cases, Mr. Lee were guaranteeing payments to Ms. Coughlin if Sheehan Insurance failed to make those payments in the future.[77] The Coughlin Guarantees, by their plain terms, recognize

---

[74] *Personal Guarantee*, Black's Law Dictionary (2d ed. 1910), https://thelawdictionary.org/personal-guarantee/ (last visited Apr. 29, 2020).
[75] *Guarantee*, Black's Law Dictionary (11th ed. 2019).
[76] *Id.*
[77] *See* Coughlin Guarantees ((promising "the sum of $600,000 as part of her compensation plan"; promising the payment of "the correct previously owed 15 RLF1 22529685v.1 commission . . . using the same split outlined in original SIG employment agreement"; and promising "the sum of $400,000 as part of her compensation plan . . . depending on the final earn out").

an underlying liability of Sheehan Insurance to make these payments. AssuredPartners sufficiently alleges that this liability never was disclosed, breaching several representations by Seller Parties.

Defendants further contend there is no violation of Section 6.11 because (i) "[t]he Coughlin Guarantee payments were made pursuant to a pre-closing payment obligation,"[78] (ii) Mr. Lee and KDW Financial were not employees,[79] and (iii) the Complaint fails to identify the holder of liability to Bob Stravinski.[80] As for the first contention, Section 6.11 may be violated even if the payments were made pursuant to a "pre-closing payment obligation," because the prohibition is on post-closing payments that are "conditioned upon, or in any way related to, such employee's performance or employment with Buyer or its subsidiaries or Affiliates during the Earn-Out Period or otherwise."[81] AssuredPartners adequately alleges that Defendants breached this obligation by making unauthorized payments to Ms. Coughlin that were part of her post-closing "compensation."[82] This count, therefore, adequately is pleaded; whether the facts bear it out is a separate issue to be resolved in discovery.

---

[78] Defs. Mot. at 20-21.
[79] *Id*. at 21.
[80] *Id*. at 20 (citing SAC ¶¶ 32, 51).
[81] APA § 6.11.
[82] SAC ¶¶ 36-37, 44.

Defendants next argue that Section 6.11 only applies to payments made "to any employee" of AssuredPartners and therefore does not encompass any allegedly improper payments to Mr. Lee and KDW Financial.[83] It is undisputed that Mr. Lee and KDW Financial never were employees of AssuredPartners.[84] AssuredPartners' complaint is vague as to what section of the APA the payments made to Mr. Lee and KDW Financial allegedly violated. The second amended complaint seems to allege that the payments were improper because AssuredPartners instructed Pat and Mark to stop using KDW Financial and Mr. Lee. To the extent, however, that AssuredPartners is claiming these payments violated Section 6.11, that particular claim would fail because Mr. Lee and KDW were not employees after closing.

The second amended complaint also sufficiently alleges that the Sellers breached the APA by not disclosing a $139,000.00 liability to Bob Stravinski, a Sheehan Insurance sales producer.[85] This liability allegedly was incurred pre-closing and paid post-closing, but was not reported in the income statement.[86] The second amended complaint alleges that the Sellers represented there were no undisclosed liabilities.[87] Therefore, the second amended complaint sufficiently

---

[83] *See* APA at ¶ 1.

[84] SAC ¶ 13 ("KDW Financial provided accounting services as an independent contractor for AssuredPartners."); SAC Ex. B ("Contractor is an independent contractor and shall not at any time hold itself (or any of its agents or representatives, including without limitation Service Provider) out to be employees of the Company.").

[85] SAC ¶ 32.

[86] *Id.*

[87] *Id.* ¶ 7.

alleges the Sellers had a duty to disclose the liabilities to Ms. Coughlin and Stravinski under the APA.

## B. Count II adequately alleges a breach of the implied covenant.

Under Delaware law, the "implied covenant is inherent in all contracts and is used to infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'"[88] The covenant of good faith and fair dealing "embodies the law's expectation that 'each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.'"[89] The good faith and fair dealing covenant protects the spirit of an agreement against underhanded tactics that deny a party the fruits of its bargain.[90]

Defendants argue AssuredPartners has not identified a contractual gap or term to be implied. To state a claim for breach of the implied covenant in Delaware, "the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[91] A claimant also must show that the parties' expectations are so fundamental that they "d[o] not feel a need to negotiate about them."[92] Under the minimal pleading standards

---

[88] *Dieckman v. Regency GP, LP*, 155 A.3d 358, 367 (Del. 2017).

[89] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006).

[90] *Marshall v. Priceline.com Inc.*, 2006 WL 3175318, at *4 (Del. Super. Oct. 31, 2006) (citing *Kelly v. McKesson HBOC, Inc.*, 2002 WL 88939, at *10 (Del. Super. Jan. 17, 2002)).

[91] *Fitzgerald v. Cantor*, 1998 WL 842316, at *2 (Del. Ch. Nov. 10, 1998).

[92] *Allied Capital*, 910 A.2d at 1032-33 (quoting *Katz v. Oak Industries*, Inc., 508 A.2d 873, 880 (Del. Ch. 1986)).

necessary to survive a motion to dismiss, AssuredPartners adequately has alleged that Sellers breached an implied contractual obligation under the earn-out agreement.

The relevant contractual provision of the APA provides that, after Buyer calculates the earn-out amount and provides its calculation to Seller, that calculation is conclusive for purposes of determining the earn-out payment and is "deemed accepted by the Seller Parties," unless Seller delivers a written objection to Buyer.[93] AssuredPartners alleges the implied contractual term that the drafters would not have needed to include in the APA's express terms is that the Sellers had an obligation to "provide truthful and accurate information to AssuredPartners to allow a fair and accurate calculation of the Earn Out Payment" and "ensure that the Earn Out Payment is fairly calculated based on the business's actual EBITDA."[94] According to AssuredPartners, since both sides "had a vested interest in determining the total amount owed post-termination, one would naturally infer that each party expected the other to 'act reasonably,' work collaboratively, and, without undue delay, come to a satisfactory amount."[95] This expectation to act reasonably and collaboratively is so "fundamental to sophisticated parties entering into an agreement after arms-

---

[93] APA § 2.06(c).
[94] SAC ¶ 65; *see also Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) ("It is true that when a contract confers discretion on one party, the implied covenant of good faith and fair dealing requires that the discretion . . . be used reasonably and in good faith.").
[95] *Brightstar Corp. v. PCS Wireless, LLC,* 2019 WL 3714917, at *13 (Del. Super. Aug. 7, 2019) (quoting *Marshall*, 2006 WL 3175318, at *4).

length negotiations that it need not be memorialized in the terms of the agreement itself."[96]

The second amended complaint further alleges the Sellers "breached that implied obligation by not objecting to the calculation of the Earn Out Payment and by accepting the incorrect and unjustified maximum Earn Out Payment."[97] The second amended complaint alleges damages resulting from Pat Sheehan and Sheehan Insurance acting to obtain the "maximum Earn Out Payment," thereby "receiv[ing] money to which they were not entitled."[98] At this early stage, these allegations are sufficient to sustain a claim for breach of the implied covenant.

**C. Plaintiff's claim for fraudulent inducement pleads damages that simply "rehash" the damages for breach of contract.**

Defendants argue AssuredPartners' fraudulent inducement claim fails to state a claim because it fails to allege fraud with the requisite particularity and does not seek damages independent from the breach of contract claim. The elements of fraudulent inducement are: "1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result."[99]

---

[96] *Id.*
[97] SAC ¶ 66.
[98] *Id.*
[99] *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Capital Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Mar. 6, 2017) (internal citation omitted).

In addition to overt representations, fraud also may occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[100] A fraud claim can be based on representations found in a contract,[101] but the allegations of fraud must be separate from the breach of contract claim.[102] Allegations that are focused on *inducement* to contract are separate and distinct conduct.[103] Furthermore, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action,[104] and those damages may not simply "rehash" the damages allegedly caused by the contractual breach.[105]

In support of its fraudulent inducement claim, AssuredPartners alleges the Sellers concealed the following material facts before closing: (1) Pat was married to the second-highest paid employee of Sheehan Insurance;[106] and (2) "the guaranteed promises of future compensation to Ms. Coughlin and significant liability to Bob Stravinski."[107] Furthermore, AssuredPartners argues that Defendants knew these

---

[100] *Addy v. Piedmonte*, 2009 WL 707641, at *18-19 (Del. Ch. Mar. 18, 2009).

[101] *ITW Glob. Invest. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2015 WL 3970908, at *5 (Del. Super. June 24, 2015).

[102] *Id*. at *6.

[103] *Id*.

[104] *Cornell Glasgow, LLC v. La Grange Properties, LLC*, 2012 WL 2106945, at *8 (Del. Super. 2012) (quoting *Dalton v. Ford Motor Co.*, 2002 WL 338081, at *6 (Del. Super. 2002)).

[105] *Cornell Glasgow*, 2012 WL 2106945, at *8–9 (dismissing a fraud claim because the plaintiffs' damages allegation was nothing more than a "rehash" of the allegations in its breach of contract claims); *see also AFH Holding Advisory, LLC v. Emmaus Life Sciences, Inc.*, 2013 WL 2149993, at *13 (Del. Super. 2013) (dismissing a fraud claim because the plaintiff's damages allegation for fraud was not separate and distinct from its damages allegation for breach of contract).

[106] SAC ¶¶ 8, 30.

[107] *Id*. ¶¶ 8, 25-32, 72-74.

representations were false and that the omissions were misleading.[108] The second amended complaint specifically alleges Defendants' fraudulent representations and omissions induced AssuredPartners to sign the APA on December 10, 2014, close the Transaction, and pay millions of dollars to Sheehan Insurance;[109] AssuredPartners reasonably relied on the false and misleading representations;[110] and AssuredPartners was damaged as a result.[111]

The facts of this case are similar to both *Novipax Holdings LLC v. Sealed Air Corp.*[112] and *Abry Partners V, L.P. v. F & W Acquisition, LLC*.[113] In *Novipax*, the plaintiff pointed to representations in the APA about how the defendant was to conduct the business and about the business's financial viability before closing. After the parties closed the transaction, however, the plaintiff learned that those representations were false, and that the defendant failed to correct the misrepresentations before the closing in order to induce the plaintiff into closing the Transaction. The Superior Court held those allegations sufficiently stated a claim for fraudulent inducement. Like the *Novipax Holdings* plaintiff, AssuredPartners alleges that Defendants did not correct their misrepresentations before closing in order to induce AssuredPartners into completing the Transaction.

---

[108] *Id.* ¶¶ 35, 45-46, 51.
[109] *Id.* ¶¶ 77-78.
[110] *Id.* ¶ 76.
[111] *Id.* ¶¶ 78-79.
[112] 2017 WL 5713307, at *13 (Del. Super. Nov. 28, 2017).
[113] 891 A.2d 1032 (Del. Ch. 2006)

In *Abry*, the parties entered into a stock purchase agreement for the buyer's purchase of a portfolio company.[114] The stock purchase agreement contained several representations and warranties about the company's financial statements.[115] After the transaction closed, the buyer discovered that the seller fraudulently had manipulated pre-signing financial statements.[116] The Court of Chancery refused to dismiss the fraudulent inducement claim, finding that the "financial statements were represented and warranted in the Agreement and were therefore intended to induce the Buyer to sign the Agreement and close the sale to purchase the Company."[117] Similarly, in this case, AssuredPartners alleges the Sellers represented that Sheehan Insurance's financial statements accurately reflected the business's financial status and that there were no undisclosed material contracts or liabilities.[118] The allegations that Sellers made those misrepresentations before closing in order to induce AssuredPartners to close the Transaction are "separate and distinct" from any allegations of later breaches of the APA.[119]

---

[114] *Novipax*, 2017 WL 5713307, at *13.
[115] *Id.*
[116] *Id.*
[117] *Abry*, 891 A.2d at 1034–35.
[118] SAC ¶ 25.
[119] *See Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *16-17 (Del Ch. Nov. 19, 2013).

Although the two claims are different, Defendants are correct that AssuredPartners pleads substantively identical damages for both claims. AssuredPartners attempts to distinguish the damages based on the fact that it:

> suffered separate and distinct damages because of these pre-closing acts of fraudulent inducement because AssuredPartners may have reduced the amount of consideration to be paid for the assets of Sheehan Insurance, may have negotiated for different terms regarding the Earn Out Period, and may have demanded stronger restrictive covenants from Brianna Coughlin.[120]

Yet, these are simply different *facts* underlying the claim rather than distinct damages. For instance, both Counts I and III allege damages from undisclosed liabilities to Ms. Coughlin of over $1.1 million and undisclosed liabilities to Bob Stravinski in the amount of $139,000.00.[121] Although companion fraud claims and breach of contract claims have at times survived a motion to dismiss, in those cases the fraud claim sought rescissory damages.[122] No rescissory damages are sought in this case. Count III therefore fails because AssuredPartners has failed to allege

---

[120] SAC ¶ 78.

[121] *Id.* ¶ 51, 73-74.

[122] *See Novipax*, 2017 WL 5713307, at *14 (finding that a claim for rescission or rescissory damages separates a fraudulent inducement claim from breach of contract damages); *ITW Glob. Invest. Inc.*, 2015 WL 3970908, at *6 ("Count I for fraud must be dismissed because it pleads damages that are simply a "rehash" of the breach of contract damages. Because Count II for fraud in the inducement pleads damages for rescission or rescissory damages, the Court will not address Count II."); *see also EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 (Del. Super. Mar. 21, 2017) (finding that plaintiff's count for fraud in the inducement is materially identical to the breach of contract complaint and rejecting plaintiff's reliance on *ITW* because plaintiff pleads neither for rescission nor rescissory damages as did the *ITW* complaint).

damages for fraudulent inducement that are distinct from the damages it seeks for breach of contract.[123]

## D. Count IV fails to state a claim for civil conspiracy.

Defendants argue that because AssuredPartners' claim for civil conspiracy is premised on its claim for fraudulent inducement, Count IV must fail as well. "[C]ivil conspiracy requires, (1) a confederation or combination of two or more parties, (2) an unlawful act done in furtherance of the conspiracy and (3) actual damage."[124] Civil conspiracy is not an independent cause of action and, instead, must be based on an underlying unlawful act.[125] If the plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed.[126]

Here, there is no underlying wrong on which a claim of conspiracy could proceed. AssuredPartners alleges Defendants conspired to fraudulently induce it to purchase Sheehan Insurance's assets at an artificially inflated price and later pay Sheehan Insurance the maximum earn-out based on misstated financials.[127] As

---

[123] This Court dismisses this claim with prejudice because the pleading deficiency persists despite Plaintiff's multiple amendments to its complaint.

[124] *WaveDivision Hldgs., LLC v. Highland Capital Mgmt. L.P*, 2010 WL 1267126, at *4 (Del. Super. Mar. 31, 2010) (citing *Nicolett v. Nutt*, 525 A.2d146, 149-50 (Del. 1987)).

[125] *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998).

[126] *Transched Sys. Ltd. v. Versyss Transit Solutions, LLC*, 2008 WL 948307, at *4 (Del. Super. Apr. 2, 2008) ("To succeed on a claim of civil conspiracy Plaintiff must first have a valid underlying claim."); *Connolly v. Labowitz*, 519 A.2d 138, 143 (Del. Super. 1986) ("To be actionable a civil conspiracy must embody an underlying wrong which would be actionable in the absence of the conspiracy.").

[127] SAC ¶ 81.

explained above, AssuredPartners fails to state a claim for fraudulent inducement. Additionally, unless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based.[128]  Likewise, a breach of the implied contractual covenant of good faith and fair dealing cannot constitute an underlying wrong unless the breach also constitutes an independent tort.[129]  Accordingly, the claim for civil conspiracy must be dismissed.[130]

**E.    Count V adequately pleads a claim for indemnification against KDW Financial and Mr. Lee.**

Defendants first argue Count V is dependent upon the success of Counts I and II, and therefore should be dismissed as those claims are not adequately pleaded under Rule 12(b)(6) and the terms of the APA.[131]  As stated above, AssuredPartners adequately has pleaded Counts I and II, so this argument fails.

Defendants next contend the second amended complaint lacks sufficient detail to apprise Mr. Lee and KDW Financial of the allegations against them. The second amended complaint alleges that the KDW Agreement imposed various contractual obligations on KDW Financial and Mr. Lee,[132] that KDW Financial and Mr. Lee

---

[128] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009).
[129] *Id.*
[130] Defendants separately argue the claim must be dismissed as to Ms. Coughlin for want of personal jurisdiction.  In light of the foregoing analysis, the court need not reach this issue.
[131] SAC ¶ 91.
[132] *Id.* ¶¶ 87-89.

failed to fulfill those obligations,[133] and that those failures create an obligation to indemnify AssuredPartners for its damages.[134]  More specifically, AssuredPartners alleges that KDW Financial and Mr. Lee agreed to (1) "provide accounting, operational and administrative services and support for [AssuredPartners']";[135] (2) agreed to provide all services "in accordance with all applicable statutes, laws, and regulations, all policies and procedures established by [AssuredPartners] from time to time, all rules of ethics applicable to members of the insurance profession, and in accordance with the appropriate standard of care";[136] (3) "manipulated financial statements and records to misrepresent AssuredPartners' post-closing EBITDA";[137] (4) "failed to provide the services in good faith, in compliance with all AssuredPartners' policies and procedures, or in accordance with the appropriate standard of care";[138] and (5) "[a]s a result of the willful misconduct or gross negligence of Mr. Lee and KDW Financial, AssuredPartners suffered losses, damages, liabilities, and expenses in the form of making the maximum Earn Out Payment to Sheehan Insurance, making unnecessary payments to Ms. Coughlin, and

---

[133] *Id.* ¶¶ 90-92.
[134] *Id.* ¶¶ 93-94.
[135] *Id.* ¶ 87.
[136] *Id.* ¶ 88.
[137] *Id.* ¶ 90.
[138] *Id.*

incurring the attorneys' fees and costs associated with this lawsuit."[139]   These

allegations are sufficient to state a claim for indemnification.

**F. AssuredPartners adequately alleges that the Sellers' fraudulent concealment tolled the statute of limitations.**

Defendants argue Counts I and II are time-barred and Count V depends on

Counts I and II and therefore also must be dismissed.  Under Delaware law, claims

for breach of contract and breach of the implied covenant are subject to a three-year

statute of limitations.[140]   Under the settled principles of law reiterated by the

Delaware Supreme Court in *Wal–Mart Stores Inc. v. AIG Life Ins. Co.*, courts apply

a three-step analysis to determine whether a claim is time-barred.[141]   First, the court

determines when the cause of action accrues.[142]   For breach of contract claims, "the

wrongful act is the breach, and the cause of action accrues at the time of breach."[143]

Second, the court determines whether the statute of limitations may be tolled so that

the cause of action accrues after the time of breach or injury.[144]   The plaintiff must

plead with specificity the basis for tolling the statute.[145]   Third, if a tolling exception

---

[139] *Id*. ¶ 92.
[140] 10 *Del. C.* § 8106.
[141] *Wal–Mart Stores Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004).
[142] *Id.*
[143] *Certainteed Corp. v. Celotex Corp*., 2005 WL 217032 at *7 (Del. Ch. Jan. 24, 2005) (citing *Ambase Corp. v. City Investing Co*., 2001 WL 167698, at *14 n. 4 (Del. Ch. Feb. 7, 2001)).
[144] *Wal–Mart Stores*, 860 A.2d 312 (Del. 2004).
[145] *Young & McPherson Funeral Home, Inc. v. Butler's Home Improvement, LLC*, 2015 WL 4656486, at *1 (Del. Super. Aug. 6, 2015); *Eni Holdings, LLC v. KBR Grp. Holdings, LLC*, 2013 WL 6186326, at *11 (Del. Ch. Nov. 27, 2013).

applies, the court determines when the plaintiff was on inquiry notice.[146]  Even if

tolling applies, the statute of limitations begins to run from the date when the plaintiff

was on inquiry notice.[147]

As explained below, the APA's Survival Clause permits tolling, and

AssuredPartners adequately pleads tolling on the basis of fraudulent concealment.

The claims concerning breach of the pre-closing obligations in Count I are timely

with time appended to account for tolling.  The claims concerning breach of the post-

closing obligations in Counts I and II are timely even without any tolling.  The

indemnification claim in Count V depends on the claims in Counts I and II and

therefore also is timely.

### i. The Survival Clause does not bar application of the tolling doctrine.

Defendants first argue that the APA's Survival Clause creates a valid

contractual limitations period for the claims related to representations and warranties

contained in Article IV of the APA.  The Survival Clause states:

> Except as otherwise provided herein, the representations and warranties
> contained in Articles IV and V hereof and in any certificate delivered
> pursuant to this Agreement shall survive the Closing for a period of two
> (2) years after the Closing Date provided, however, that … (c) if any
> representation or warranty contained in Article IV or V hereof is
> fraudulently given, it shall survive the Closing Date until sixty (60)
> days after the expiration of the applicable statute of limitations … All

---

[146] *Wal–Mart Stores*, 860 A.2d 312.
[147] *Id.*

covenants and other agreements in this Agreement shall survive the Closing and not terminate. [148]

The parties dispute whether AssuredPartners' allegations fall within Section 7.01(c) of the APA. Defendants argue that the APA's two-year contractual statute of limitations applies to all Counts because they all "arise out of the expired representations and warranties."[149] In summary, Defendants argue (1) Count I expressly alleges breaches of Article IV; and (2) Counts II and V correspond with Sections 4.12, 4.13, 4.15, and 4.33 of the APA; and (3) Count V is dependent upon the success of Counts I and II. As such, Defendants allege that all Counts accrued on the date of the closing. Although Count I also expressly references the Sellers' post-closing obligations under Section 6.11 to not pay "without the prior executed written consent" of AssuredPartners "any bonus, compensation, or other renumeration to any employee" of AssuredPartners,[150] Defendants contend the alleged breach of Section 6.11 accrued before closing because the statute of limitations accrues at the time the Coughlin Guarantees were awarded. Defendants do not address the express reference to Section 2.06 in Count II.[151]

AssuredPartners argues that Section 7.01(c) allows for tolling. AssuredPartners makes this argument under the apparent assumption that Section

---

[148] APA § 7.01.
[149] Defs. Mot. at 11.
[150] *See* SAC ¶ 50.
[151] *See id.* ¶ 63.

7.01(c) should apply to all counts. Furthermore, AssuredPartners contends the Section 6.11 claim is timely even without tolling because the statute of limitations should accrue at the time of the last payment under the Coughlin Guarantees, which allegedly was "as late as March 2017."[152]

It is unclear, at this stage of the proceedings, whether AssuredPartners ultimately may prove that Article IV's pre-closing representations and warranties were "fraudulently given," thereby implicating Section 7.01(c). At this stage, however, it is sufficient that AssuredPartners pleads that Sellers made representations they knew to be false. More importantly, as set forth below, it is immaterial at this stage whether Section 7.01(c) applies to some or all of Plaintiff's claims. Even if the two-year contractual limitations period in Section 7.01 applies to these pre-closing obligations, that period nevertheless may be tolled by Defendants' alleged fraudulent concealment, which Plaintiff adequately pleads. Lastly, it is clear at this stage that the parties intended the post-closing obligations set forth in Sections 2.06 and 6.11 as covenants that "shall survive the Closing and not terminate." These covenants only survive for the applicable statute of limitations period, including any tolling, as further explained below.

---

[152] SAC ¶ 56.

35

## 1. Pre-closing obligations

As part of the *Wal-Mart* analysis, this Court first must determine when the cause of action accrues. There is no dispute that representations and warranties concerning pre-closing obligations typically accrue at the time of the closing and that the claims would be untimely absent any tolling.[153]

Second, the court must ascertain whether tolling applies. First, Defendants argue that the clause stating representations and warranties "shall survive the Closing for a period of two (2) years after the Closing Date" necessarily means that all claims expired on December 11, 2016, two years after the closing, with no allowance for tolling. Second, Defendants argue that even if the "applicable statute of limitations" in Section 7.01(c) applies, AssuredPartners would be required to bring its claims within three years after the Transaction closed. Defendants contend the phrase "applicable statute of limitations" does not allow for tolling.

Under Delaware law, parties' contractual choices are respected and there is no special rule requiring that in order to contractually shorten the statute of limitations, parties utilize "clear and explicit" language.[154] Delaware courts have interpreted contractual provisions that limit the survival of representations and warranties as evidencing an intent to shorten the period of time in which a claim for

---

[153] *See CertainTeed*, 2005 WL 217032, at *8 ("[U]nder 10 Del. C. § 8106, [Defendant's] misrepresentations are also subject to a three-year statute of limitations, and whether treated as a breach of contract or as tort, the accrual date as to all of these claims was the date of Closing.").
[154] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011).

breach of those representations and warranties may be brought.[155]  The question of

whether the parties' contract adopts tolling turns on the contractual language the

parties chose.

In *GRT, Inc. v. Marathon GTF Tech., Ltd.*, the Court of Chancery conducted

a tolling analysis despite a survival clause that contained language similar to the

clause here.[156]  The relevant language in *GRT* stated:

> The representations and warranties of [GRT] contained in Section 3.16
> *shall survive until the expiration of the applicable statutes of limitations*
> ..., and will thereafter terminate, together with any associated right of
> indemnification pursuant to Section 7.3. All other representations and
> warranties in Sections 3 and 4 will survive for twelve (12) months after
> the Closing Date, and will thereafter terminate, together with any
> associated right of indemnification pursuant to Section 7.2 or 7.3 or the
> remedies provided pursuant to Section 7.4.[157]

The Court of Chancery held that the survival clause created a one-year statute of

limitations and proceeded to consider whether tolling should apply.[158]  It dismissed

the breach of representation claims as barred by the statute of limitations on the

grounds that the plaintiff did not adequately plead that a tolling exception should

apply.[159]   Similarly, in *Kilcullen v. Spectro Sci., Inc.*, the Court of Chancery

examined a survival clause that provided:

---

[155] *See id.*; *Sterling Network Exchange, LLC v. Digital Phoenix Van Buren, LLC*, 2008 WL 2582920, at *1 (Del. Super. Mar. 28, 2008); *Campanella v. General Motors Corp.*, 1996 WL 769769, at *1 (Del. Super. Nov. 6, 1996).
[156] *GRT*, 2011 WL 2682898, at *12.
[157] *Id.* at *7.
[158] *Id.* at *17.
[159] *Id.*

all representations and warranties in this Agreement [other than certain representations and warranties not relevant here] ... shall terminate on the date that is twelve (12) months following the Closing Date.[160]

The Court of Chancery explicitly stated that the contractual limitations period permitted tolling.[161]

Section 7.01 of the APA similarly permits tolling. The contractual language the parties selected does not expressly or impliedly eliminate tolling. Rather, the clause simply creates a default two-year limitations period and provides for a longer period in the event certain representations are fraudulent. If the intent was to make the closing date the effective accrual date for bringing a claim, the contract would have so stated.

As for Section 7.01(c), Defendants argue that even if the termination date was set for sixty days after the expiration of the applicable statute of limitations, it does not follow that the parties contracted to allow for tolling. Defendants contend interpreting Section 7.01(c) to allow tolling would extend claims for fraudulent representations under Articles IV or V for the applicable statutory period, plus time appended to account for tolling, plus sixty additional days. Defendants argue this interpretation would contravene Delaware law.

---

[160] *Kilcullen v. Spectro Sci., Inc.*, 2019 WL 3074569, at *5 (Del. Ch. July 15, 2019).
[161] *Id.*

At the February 10, 2020 hearing, AssuredPartners argued that 10 *Del. C.* § 8106(c) expressly allows parties to extend the statute of limitations by contract.[162] Before Section 8106(c) became effective on August 1, 2014, the maximum contractual survival period was three years under a series of decisions holding that contracting parties could shorten but not lengthen a statute of limitations.[163] Parties now contractually may extend the statute of limitations up to a maximum of twenty years under Section 8106(c).[164]

Section 8106(c) states:

Notwithstanding anything contrary in the chapter, an action based on a written contract, agreement or undertaking involving at least $100,000 may be brought within a period specified in such written contract, agreement or undertaking provided it is brought prior to the expiration of 20 years from the accruing of the cause of such cause of action.[165]

Consistent with the contractarian principles undergirding Delaware law, Section 8106(c) was adopted to allow parties to contract around Delaware's statute of limitations for certain actions based on a written contract, agreement or

[162] *See* Transcript of Motions held on 2-10-20 before The Honorable Abigail M. LeGrow, Trans. 65555751, 49:18-50:19.

[163] *Menefee, ex rel. Menefee v. State Farm Mut. Ins. Co.*, 1986 WL 630314, at *1 (Del. Super. July 11, 1986) ("[A] contract provision for a longer period of limitation than provided by the applicable statute would be void as against public policy."); *Shaw v. Aetna Life Ins. Co.*, 395 A.2d 384, 386–87 (Del. Super. 1978) ("Two parties contracting between themselves cannot agree to circumvent the [statute of limitations] as mandated by the legislature in its attempt to protect the public interests.").

[164] *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *14 (Del. Ch. Jan. 12, 2015).

[165] 10 *Del. C.* § 8106(c).

undertaking.[166]  Section 8106(c) supplants the statute of limitations in Section 8106(a) if: (1) the claims are based on a written contract; (2) the contract involved at least $100,000; and (3) the contract specifies a period for claims to accrue.[167] There is no dispute that the claims in the complaint are based on a written contract that involves at least $100,000.

The only remaining issue is whether the APA specified a period for claims to accrue.  Although the "period specified" can refer to a particular date, the statutory amendment also contemplated other measures, including "a period of time defined by reference to the occurrence of some other event or action, another document or agreement or another *statutory period*" and "an indefinite period of time."[168]  If the contract specified an indefinite period, then the action nevertheless must be brought "prior to the expiration of 20 years from the accruing of the cause of such action."[169]

In *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, the Court of Chancery held that the parties properly invoked Section 8106(c) and contracted around the three-year statute of limitations.[170]  As that court explained, a claim for breach of the representations and warranties normally begins to accrue on the date

---

[166] *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *12 (Del. Ch. Jan. 12, 2015) (citing Synopsis to House Bill No. 363).
[167] *Id.*
[168] Synopsis to House Bill No. 363 (emphasis added).
[169] 10 *Del. C.* § 8106(c).
[170] 2015 WL 139731 at *15.

of closing.[171]  In *Bear Stearns*, however, the contract included a survival clause providing that the representations and warranties "shall survive" the closing.[172]  In addition, the contract contained an accrual provision providing that "a cause of action ... shall accrue" only after the defendant both discovered the breach and failed to take remedial action.[173]  The court found that the language of the accrual provision "constituted 'a period of time defined by reference to the occurrence of some other event or action' that is a sufficient 'period specified' for purpose of Section 8106(c)."[174]  As a result, the combination of the survival clause and accrual provision "operated to extend the statute of limitations up to the statutory maximum of twenty years."[175]

In contrast, in *Hydrogen Master Rights, Ltd. v. Weston*, the District Court of Delaware held the parties did not intend to extend the limitations period under Section 8106(c) where the purchase agreement provided that the representations and warranties "survive closing" without expressly addressing the accrual of a claim.[176]

The issue before this Court is whether the language extending the limitations period for sixty days after the expiration of the "applicable statute of limitations" in Section 7.01(c) is a sufficient "period specified" for purposes of Section 8106(c).

---

[171] *Id*. at *7.
[172] *Id*. at *15.
[173] *Id*.
[174] *Id*.
[175] *Id*.
[176] *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 330 (D. Del. 2017).

Section 7.01(c)'s reference to the applicable statute of limitations invokes the three-year statutory period in Section 8106. That period—three years and sixty days after a claim accrues—is a sufficiently defined period under Section 8106(c). Additionally, unlike the "warranties survive closing" language of the purchase agreement in *Weston*, the APA specifies sixty days *after* the applicable statute of limitations.[177] Sixty days is a clear period of time and the language used suggests an intention to lengthen the statute of limitations. Furthermore, Section 8106(c) expressly contemplates the use of a statutory period to define the contractual limitations period.[178]

This contractually extended limitations period also permits tolling. Contrary to Defendants' assertion that allowing for tolling would contravene the language calling for only "sixty days after the applicable statute" of limitations, the tolling doctrine defines when a claim accrues for purposes of the statute of limitations. The "sixty days after the applicable statute of limitations" language does not indicate an intention to shorten to statute of limitations or replace the analysis of when a claim accrues. Rather, as described above, it extends the statute of limitations. Therefore, Section 7.01(c) adopts a three years and sixty days limitations period for claims that

---

[177] *Id.*
[178] Synopsis to House Bill No. 363.

representations and warranties fraudulently were given, with any such claim accruing as it otherwise would under Delaware law, including any applicable tolling.

## 2. Post-closing obligations

Section 7.01 of the APA provides "[a]ll covenants and other agreements in this Agreement shall survive the Closing and not terminate."[179] This clause encompasses the parties' post-closing obligations in Sections 2.06 and 6.11.

First, Defendants contend that the cause of action accrued when the Coughlin Guarantees were awarded. AssuredPartners argues the date of accrual was at the time of the last payment in March 2017. *Wal–Mart* holds that a cause of action accrues "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[180] The "wrongful act" is a general concept that varies depending on the nature of the claim at issue.[181] For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach.[182]

Unlike the alleged breaches of representations and warranties in Article IV, which typically accrue on the date of the closing absent any tolling, these post-closing obligations necessarily accrued after the closing. At this stage, AssuredPartners has sufficiently alleged that "Pat and Sheehan Insurance also

---

[179] APA § 7.01.
[180] *Wal-mart*, 860 A.2d at 319.
[181] *Certainteed*, 2005 WL 217032, at *7.
[182] *See Ambase Corp. v. City Investing Co.*, 2001 WL 167698, at *14 n. 4 (Del. Ch. Feb. 7, 2001).

breached Section 6.11" of the APA by making unauthorized payments to AssuredPartners' employees "as late as March 2017."[183] Additionally, AssuredPartners alleges the Sellers breached the implied covenant of good faith and fair dealing in Section 2.06 by "not objecting to the calculation of the Earn Out Payment and by accepting the incorrect and unjustified maximum Earn Out Payment."[184] AssuredPartners further alleges that the Earn Out Payment was paid on March 10, 2017.[185] Finally, Assured Partners alleges Defendants fraudulently concealed these payments. As set forth below, to the extent these post-closing claims were not filed within three years of the payments being made, Assured Partners adequately pleads tolling.

### ii. AssuredPartners pleads sufficient facts for the doctrine of fraudulent concealment to apply.

To toll a limitations period on the basis of fraudulent concealment, a plaintiff must show that the defendant "knowingly acted to prevent [the] plaintiff from learning facts or otherwise made misrepresentations intended to 'put the plaintiff off the trail of inquiry.'"[186] Fraudulent concealment "requires an affirmative act of concealment by a defendant—an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a

---

[183] SAC ¶ 56.
[184] *Id.* ¶ 66.
[185] *Id.* ¶ 16.
[186] *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 531 (Del. Ch. 2005) (quoting *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973)).

plaintiff off the trail of inquiry."[187]  Mere silence is insufficient to establish fraudulent concealment.[188]  The partial disclosure of facts in a misleading or incomplete way, however, can rise "to the level of actual artifice."[189]  In addition to actively concealing facts from the complaining party, the actor must have intended to prevent inquiry or knowledge of the injury.[190]  If fraudulent concealment occurs, then "the statute is suspended only until [the plaintiff's] rights are discovered or until they could have been discovered by the exercise of reasonable diligence."[191]

In *BTIG, LLC v. Palantir Techs., Inc.*, the defendants argued that the plaintiff's claims for tortious interference with prospective economic advantage and civil conspiracy were untimely.  The plaintiff, the broker of a potential transaction, claimed the defendants conspired to capture the economic benefits of its potential transaction for themselves and that the doctrines of fraudulent concealment and "inherently unknowable injury" should apply to its claims.  The Superior Court held the plaintiff adequately had alleged tolling at the motion to dismiss stage where it claimed (1) one of the defendants had given false statements to plaintiff in representing that it would facilitate the plaintiff's deal; (2) that defendant had control

---

[187] *Ryan v. Gifford*, 918 A.2d 341, 360 (Del. Ch. 2007) (internal quotation marks and footnote omitted).

[188] *Krahmer v. Christie's Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006).

[189] *In re Tyson Foods, Inc.*, 919 A.2d 563, 588 (Del. Ch. 2007).

[190] *Lock v. Schreppler*, 426 A.2d 856, 860 (Del. Super. 1981); *Nardo v. Guido DeAscanis & Sons, Inc.*, 254 A.2d 254, 256 (Del. Super. 1969).

[191] *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 531 (Del. Ch. 2005) (citing *Shockley v. Dyer*, 456 A.2d 798, 799 (Del.1983)).

over the documents that gave rise to the plaintiff's tortious interference claim and also had taken efforts to keep the documents from becoming public; and (3) the documents showed that the defendants surreptitiously were scheming to "crush" and "shut down" the transaction and thus mislead the plaintiff.[192] For tort claims, the cause of action typically accrues at the time of injury.[193] Although the defendants argued the injury occurred when the transaction failed to close, the Superior Court held that the doctrines of inherently unknowable injury and fraudulent concealment applied to toll the accrual of the statute of limitations to the point at which the documents publicly were revealed in a court filing.[194]

Similarly, Defendants allegedly took affirmative steps to keep AssuredPartners from discovering the Coughlin Guarantees and the post-closing payments. AssuredPartners pleaded facts with sufficient particularity to show that the doctrine of fraudulent concealment ultimately may apply to toll the statute of limitations. For example, AssuredPartners avers that (1) "[p]ursuant to payment guarantees surreptitiously executed by Defendants Pat, Mark, Mr. Lee and Ms. Coughlin the day before the APA was signed, Ms. Coughlin was fraudulently awarded over $1.1 million in guaranteed compensation, which was not disclosed to

---

[192] 2020 WL 95660, at *6 (Del. Super. Jan. 3, 2020).
[193] *Certainteed*, 2005 WL 217032, at *7 (citing *Ambase Corp. v. City Investing Co.*, 2001 WL 167698, at *14 n.4 (Del. Ch. Feb. 7, 2001) and *Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992)).
[194] *BTIG*, 2020 WL 95660, at *6.

AssuredPartners";[195] (2) "Defendants fraudulently concealed improper payments by not recording transactions within the financial statements submitted to AssuredPartners post-closing and using misleading descriptions for payments within account management software";[196] (3) "Pat, through his agents Mr. Lee, KDW Financial, and Ryan Henson, submitted regular financial records to AssuredPartners regarding the post-closing operations of the purchased business";[197] (4) "[e]ach and every one of the financial records failed to disclose and intentionally omitted the liabilities owed to Ms. Coughlin and Bob Stravinski, and failed to disclose and intentionally omitted the associated expenses when those payments were ultimately made in 2015, 2016, and 2017";[198] (5) "Pat and Sheehan Insurance represented that the financial statements of Sheehan Insurance provided to AssuredPartners accurately reflected the financial status of Sheehan Insurance and that there were no undisclosed material contracts or undisclosed liabilities";[199] (6) "Pat and Sheehan Insurance provided false or misleading financial information to AssuredPartners, causing AssuredPartners to believe that the company's EBITDA was higher than it was, in fact, and thus misrepresented the value of the business at the time of purchase and the performance of the business at the time of the Earn Out Payment";[200] (7)

---

[195] SAC ¶ 16.
[196] *Id.* ¶ 46.
[197] *Id.*
[198] *Id.*
[199] *Id.* ¶ 25.
[200] *Id.* ¶ 62.

"[b]ecause Pat retained full control over Sheehan Insurance's existing bank accounts with BB&T after closing, these post-closing payments were made 'off the books' without AssuredPartners' knowledge";[201] (8) "[a]s a result of Defendants' concealment, AssuredPartners did not discover unauthorized payments to KDW Financial until 2018";[202] (9) "[t]his triggered additional scrutiny and an internal investigation by AssuredPartners that led to the discovery of additional facts";[203] and (10) "[b]ecause of Defendants' concealment, AssuredPartners did not discover the Brianna Coughlin Guarantees until January 2019."[204] These detailed allegations, if proved at trial, would support tolling the statute of limitations on the basis of fraudulent concealment.

Lastly, Defendants do not argue that AssuredPartners could have discovered the facts underlying these claims by the exercise of reasonable diligence or that it was on inquiry notice at any point before AssuredPartners' discovery of the payments. Any such argument must await further development of the factual record. In short, dismissal on the basis of the statute of limitations would be premature at this stage of the proceedings.

---

[201] *Id.* ¶ 46.
[202] *Id.* ¶ 47.
[203] *Id.*
[204] *Id.*

## CONCLUSION

For the forgoing reasons, Defendants' Motion to Dismiss is **GRANTED** as to

Counts III and IV; and **DENIED** as to Counts I, II, and V.  **IT IS SO ORDERED.**