Johannes R. KRAHMER and Betty P. Krahmer, Petitioners,

v.

CHRISTIE'S INCORPORATED, Respondent.

C.A. No. 606–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 25, 2006.

Decided: Oct. 17, 2006.

40. The prior panel opinion issued on July 13, 2006 is withdrawn.

Victor F. Battaglia, Sr., Esquire, Biggs and Battaglia, Wilmington, Delaware Attorneys for the Petitioners.

Melanie K. Sharp, Esquire, Seth J. Reidenberg, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Michael E. Salzman, Esquire, Russell W. Jacobs, Esquire, Hughes Hubbard & Reed, LLP, New York, New York, Attorneys for the Respondent.

## OPINION

LAMB, Vice Chancellor.

The purchasers of a painting acquired at auction in 1986 filed a petition for rescission against the auction house. The purchasers allege that the auction house committed fraud by intentionally concealing that the painting was not an original work of the artist. The auction house now moves for summary judgment. The record contains no evidence from which the court can reasonably infer scienter on the part of the auction house. The court also finds that the petition was not timely filed. Therefore, the motion for summary judgment must be granted.

## I.

### A. *The Parties*

The respondent is Christie's, Inc., a renowned New York corporation whose principal line of business is to take valuable works of art, collectibles, and other finery on consignment for sale at its public auctions. Christie's maintains various sale rooms worldwide and has acted as an auctioneer for precious artwork since its first sale in London in 1766.[1] Its main American auction rooms are in New York City and were the site of the sale at issue here.[2]

The petitioners are Johannes R. Krahmer and Betty P. Krahmer, a couple who collect American art. Not surprisingly, both are well educated and hold advanced degrees. In 1986, Johannes Krahmer was an attorney with a local Delaware law firm. Betty Krahmer was an economic analyst for the Central Intelligence Agency and earned a graduate degree in economics from the London School of Economics.

1. Christie's has auctioned works by such painters as Picasso, Rembrandt, and van Gogh. Perhaps Christie's most famous transaction was the negotiation of the sale of Sir Robert Walpole's art collection to Catherine the Great of Russia. Walpole's collection is now a part of the Hermitage Museum in St. Petersburg.

2. The petition states that Christie's regularly conducts business in Delaware by soliciting business and by regularly providing appraisal services within the meaning of 10 *Del. C.* § 3104(c)(1), (2), and (4).

B. *The Facts*[3]

In 1986, Jay Cantor, the head of Christie's American paintings division, met with the directors of the Detroit Club to discuss the consignment and sale of several paintings. Among the works was *Interior*, an oil painting depicting a young woman in the half light standing beside a table. *Interior* was purportedly painted by Frank Weston Benson in 1912.

Cantor researched the provenance of *Interior*. According to its records, the Club acquired the painting in 1914. A representative of the Club told Cantor that *Interior* was acquired directly from Benson. Additionally, the Club's documentation revealed that *Interior* was independently appraised as a Benson piece at least three times between 1925 and 1985.

In 1986, the Club's board of directors decided to sell *Interior*, as well as a work by Oscar E. Berninghaus, "to defray the boiler and other extraordinary capital expense incurred" during 1985. In selecting which pieces to sell, the Club sought recommendations from Samuel Sachs, the director of the Detroit Institute of Arts.[4]

According to the Club's records, the fact that these two paintings were chosen for sale is not surprising. Neither was gifted to the organization by an identifiable donor and neither was displayed in a prominent location inside the Club. Thus, the Club believed that the absence of the paintings would be less noticeable than if other works were sold. The Club's directors were apparently concerned about the notoriety of the sale, lest the transaction be seen as a sign of financial instability for the Club.

According to Cantor's affidavit, when *Interior* arrived at Christie's, the respondent's employees inspected the painting and critically examined its style, subject matter, and signature. Cantor believed that the painting's frame was period. Christie's experts noted that *Interior* depicted an indoor scene of a type that Benson often painted. Additionally, Cantor believed that the color palette and style were also consistent with Benson's work.

In May 1986, Christie's offered *Interior* for auction, with an estimate of $70,000 to $90,000.[5] As the high bid of $48,000 did not meet the reserve price of $55,000, the painting went unsold. The offering catalogue represented the painting's provenance as a "midwestern club."[6] At the behest of the Club, Christie's relisted the painting in December 1986, lowering the estimate to between $40,000 and $60,000 while dropping the reserve price to $35,000.

The Krahmers purchased the painting at auction on December 5, 1986. Although Christie's removed its representation as to the painting's ownership by a "midwestern club" from the December catalogue, the Krahmers received a nameplate from Christie's following their purchase which

---

3. The facts in this case are largely uncontroverted and are the product of extensive discovery taken by the parties. The record contains numerous affidavits and depositions. The affiants and deponents include both of the Krahmers, a number of Christie's' former employees who were responsible for the painting's consignment, and several museum curators and art experts. While the facts are not the subject of much dispute, the inferences drawn from those facts are hotly contested in this motion.

4. Before working in Detroit, Sachs was the director of the Minneapolis Art Museum. Later, Sachs became director of the Frick Collection in New York.

5. *Krahmer v. Christie's, Inc.*, 903 A.2d 773, 775 (Del.Ch.2006).

6. *Id.*

showed that the painting belonged to the Detroit Club of Michigan.[7] Cantor congratulated the petitioners on their purchase and offered to provide an appraisal for insurance purposes. Before the auction, the Krahmers had received the December catalogue of the paintings for sale. This catalogue conspicuously stated that a six-year limited warranty of authenticity governed the sale of *Interior*.[8]

On March 2, 1987, Christie's provided an insurance appraisal of the painting and listed $38,500, the amount the Krahmers paid, as the valuation. In 1990, Cantor visited the Krahmers' home and, in addition to valuing other works of art owned by the couple, raised the appraised value of *Interior* to $85,000.

In November 1999, while attempting to authenticate the painting, the Krahmers applied to the Catalogue Raisonné Committee for F.W. Benson at the Vose Galleries in Boston.[9] While the application was pending, the Krahmers learned of a painting strikingly similar to *Interior*. This painting was housed at the New Britain (Connecticut) Art Museum. When the Krahmers brought this to the Committee's attention, they were told that Benson may have painted two works depicting the same scene.

The Krahmers tried to sell *Interior* on consignment to Sotheby's auction house in the spring of 2002. A restorer for Sotheby's examined the painting and cautiously observed that it might be a forgery.[10] Sotheby's declined to consign the painting. The Krahmers allege that the Sotheby's decision finally raised their suspicion to the possibility that *Interior* was not genuine. After informing the respondent of the Sotheby's decision, the parties agreed to have the Committee determine whether or not the painting was a forgery.

The Committee concluded that *Interior* was not Benson's work. It opined that the New Britain Museum's painting was more consistent with Benson's style and that *Interior* lacked several important traits of authenticity. Further, the Committee found documentary evidence showing that the figure in Benson's original painting wore a string of pearls. The woman depicted in the New Britain painting displays this necklace, which *Interior* lacks.

The Committee believed that the original painting was sold to the Detroit Club and then somehow came into the hands of an art dealer named Donald Purdy by 1973, at which time the New Britain Museum obtained it. Thus, the Committee theorized that the original painting was removed from its frame at the Detroit Club and sold to the New Britain Museum, only

---

7. *Id.*

8. The warranty provides that "Christie's warrants for a period of six years from the date of sale that any article described in ... this catalogue ... which is unqualifiedly stated to be the work of a named author or authorship, is authentic and not counterfeit." Falsetta Aff. Ex. J.

9. *Krahmer*, 903 A.2d at 775–76. The Committee was not established until 1991. Vose Dep. 8–9. Generically speaking, a catalogue raisonné committee is a group of scholars who are intimately familiar with the work of a particular artist. Normally, either an art gallery or a group of art collectors will raise and commission such a committee to create an exhaustive list of an artist's authenticated works known as a "catalogue raisonné."

10. Restorer Simon Parke noted, "At first glance, this is an image which is reminiscent of Benson's work. At second glance, the picture seems to have been broadly retouched in a very clumsy fashion because the painting has been over cleaned and damaged in many different ways.... I am sure the signature is not period, and it seems to be on top of a lot more varnish and repaint." Petition ¶ 12 & Ex. F.

to be replaced with the forgery which the Krahmers eventually purchased. Upon receiving the Committee's report, the Krahmers asked Christie's to rescind the 1986 sale. Christie's refused, reasoning that the six-year warranty of authenticity on the painting had expired years before. On July 29, 2004, the Krahmers filed a petition for rescission, essentially advancing the Committee's postulations under a legal theory of fraud.

## II.

In January 2006, the Krahmers moved to amend their petition to include claims of mutual mistake of fact, negligent misrepresentation, and constructive fraud. In a June 2006 opinion, this court denied the motion to amend because the Krahmers could not establish that the three-year statute of limitations applicable to the proposed amendments that otherwise expired by 1990 was tolled under the "inherently unknowable injury" exception.[11] This court also held that the proposed amendments, in any case, failed to state a claim for negligent misrepresentation.[12] The Delaware Supreme Court subsequently denied the petitioners' request for interlocutory appeal on those issues.[13] Christie's now moves for summary judgment on the Krahmers' original fraud claim.

The Krahmers allege that Christie's fraudulently induced them to believe that the painting they purchased in December 1986 was a true Benson. Specifically, the petition claims that Christie's' "intentional misrepresentation of the authenticity of the Painting, and its subsequent appraisal of the Painting at more than twice the

amount of Petitioner's purchase price, constituted fraud."[14] According to the Krahmers, Christie's knowingly or recklessly disregarded flaws in *Interior's* provenance and heritage while guaranteeing the painting's authenticity in a contrived effort to lull them into a false sense of security with regard to their purchase. The Krahmers also argue that by the conveyance of the nameplate and by the subsequent appraisals, Christie's fraudulently concealed *Interior's* inauthenticity, thereby causing the statute of limitations to toll.

Christie's simply argues that the Krahmers lack an evidentiary basis for their fraud theory and therefore their claim is mere conjecture. Christie's posits that the record clearly demonstrates how it performed due diligence on the painting prior to the auction and uncovered nothing to cloud its authenticity. Therefore, Christie's did not possess the scienter necessary for fraud. At most, Christie's argues, the Krahmers can show negligence, a cause of action not pleaded in the petition and one previously foreclosed by this court's denial of the petitioners' motion to amend. Finally, Christie's reasons that the Krahmers cannot support a theory of tolling of the limitations period based upon fraudulent concealment because the Krahmers were on inquiry notice in 1999 that the painting was not an original Benson.

## III.

∎ A court will grant a motion for summary judgment if the evidence of record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[15]

---

11. *Krahmer*, 903 A.2d at 783.

12. *Id.* at 785.

13. *Krahmer v. Christie's, Inc.,* 906 A.2d 806, 2006 WL 1725593 (Del. June 20, 2006).

14. Petition ¶ 20.

15. Court of Chancery Rule 56(c). *See also Williams v. Geier,* 671 A.2d 1368, 1375 (Del. 1996).

When the intent of a party is at issue, summary judgment is ordinarily inappropriate.[16] However, if the nonmoving party bears the ultimate burden of proof with regard to a particular claim, "summary judgment is proper if the moving party can show a failure of proof concerning an element that is essential to the nonmoving party's case."[17]

## IV.

The court concludes that summary judgment in favor of Christie's is appropriate here for two reasons. First, even assuming the painting is a forgery,[18] the Krahmers fail to point to evidence from which the court might reasonably infer scienter on Christie's' part. Second, the Krahmers cannot establish tolling of the statute of limitations based upon the doctrine of fraudulent concealment.

### A. *The Krahmers Fail To Present Evidence Of Scienter With Respect To The Auction Sale*

■ To succeed on a claim of fraud under New York law,[19] a plaintiff must prove he relied upon, and was injured by, a false representation of material fact made by the defendant.[20] Importantly, the plaintiff must also show the presence of scienter. That element is satisfied only if the misrepresentation was "known to be untrue or recklessly made."[21] Fraud under New York law "includes pretense of knowledge when there is none and if a statement is recklessly made without knowledge or without genuine belief in its truth the statement may be actionable."[22] But if the evidence in the record establishes that a defendant genuinely believed in the truth of a representation, a plaintiff cannot prove the scienter necessary to sustain a fraud claim.[23]

■ The uncontradicted testimony of the Christie's representatives involved with the painting establishes Christie's' genuine belief that *Interior* was an authentic Benson work. At the time of the consignment, the painting's provenance was solid and well documented.[24] Nothing existed in the Detroit Club's records or repre-

---

**16.** *Ward v. Gen. Motors Corp.*, 431 A.2d 1277, 1281 (Del.Super.1981).

**17.** *Burkhart v. Davies*, 602 A.2d 56, 60 (Del. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**18.** The court must assume that *Interior* is a forgery for purposes of this motion. Christie's concedes as much, but notes that "potentially further analysis is necessary to make a determination on authorship." Resps.' Opening Br. 17 n. 6.

**19.** The parties agree that New York law applies to the substantive claims in this litigation, while Delaware law applies with respect to the statute of limitations issue. *Krahmer*, 903 A.2d at 783 n. 60 (citing *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods.*, 832 A.2d 116, 124 (Del.Ch.2003)).

**20.** *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892, 898 (1999).

**21.** *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 250 N.E.2d 214, 217 (1969).

**22.** *Terris v. Cummiskey*, 11 A.D.2d 259, 262, 203 N.Y.S.2d 445 (1960).

**23.** *See, e.g.,* Board of Educ. v. Sargent, Webster, Crenshaw & Folley, 146 A.D.2d 190, 199, 539 N.Y.S.2d 814 (1989) (affirming a directed verdict where there was "far from clear and convincing evidence that [the defendant] had anything but a genuine belief that the remedial measures it ordered were sufficient").

**24.** Douglas Hyland, the director of the New Britain Museum, testified that he, his museum, and his colleagues often rely heavily upon provenance to authenticate artwork. Hyland Dep. 12, 21. Abbot Vose, the chair of the Benson Committee, stated as much also. Vose Dep. 11–12. Notably, the Krahmers do not argue that Christie's' reliance on the provenance of *Interior* was contrary to art industry norms.

sentations that would raise a modicum of suspicion about the painting's history. When Christie's inspected the painting before the sale, the style and subject matter were deemed typical of Benson's other work. The painting's frame was consistent with those of Benson's time. All of this uncontradicted evidence is entirely consistent with the conclusion that Christie's had a good faith basis to believe, and in fact did believe, that the painting it sold to the Krahmers was authentic. Moreover, the extensive discovery undertaken in this case has not revealed any evidence inconsistent with Christie's' good faith belief in the authenticity of *Interior* at the time of the sale. Because the Krahmers fail to proffer evidence from which this court could reasonably infer that Christie's acted with scienter, the Krahmers' fraud theory remains just that and there is no triable issue of fact regarding the presence of scienter needed to prove fraud.[25]

Indeed, the present record, at the very most, supports a claim of negligence rather than recklessness.[26] Perhaps given unlimited time, Christie's could have conducted an exhaustive search for similar paintings throughout the country. Perhaps given unlimited resources, Christie's

might have hired a team of experts to meticulously examine the finer points of the painting. Such time and expense were probably necessary to determine beyond all doubt that Benson authored the painting.

But, at the time of the sale, there was no available catalogue raisonné of Benson's work. Commissioning a raisonné committee was quite obviously both economically and temporally infeasible. Thus, no efficient avenue was available by which to unequivocally verify the authenticity of the Krahmers' painting. Instead, Christie's adhered to prevailing business practices in the auction house market when it attributed the painting to Benson.[27] The Krahmers have not produced any evidence to contradict the propriety of Christie's' due diligence or to support an inference that Christie's acted recklessly with respect to its representations about *Interior*.[28] Thus, summary judgment is appropriate.

B. *The Krahmers' Claim Of Fraud Is Not Timely*

Even if there were facts in the record that, if proven at trial, would support an inference that Christie's possessed the scienter necessary to support fraud in the

---

25. The petitioners rely heavily on the Committee's theory that Donald Purdy somehow came across the true Benson painting. However, they have not deposed Purdy and have not presented any evidence as to his relationship to the Detroit Club or *Interior*. The court cannot bridge the gap for the Krahmers between Purdy committing forgery and Christie's having knowledge of that forgery without evidence that the former act in fact occurred.

26. As this court previously held, the absence of a special relationship between Christie's and the Krahmers bars a valid cause of action under a negligence theory. *Krahmer*, 903 A.2d at 784–85.

27. Indeed, it would stretch reason to expect Christie's to spend thousands of dollars and

hundreds of employee hours researching a $35,000 painting. Were such expenditures made, the commission expenses might be substantial enough to price all prospective bidders out of the market. Additionally, the court believes it is unlikely that Christie's would have knowingly risked its professional reputation on a $3,000 sales commission. The evidence in the record supports this notion, as both Hyland and Vose doubted that Christie's would offer a painting with questionable *bona fides*. Vose Dep. 35. Hyland Dep. 22–23.

28. Indeed, Johannes Krahmer himself acknowledges that he has no informational basis to support his belief that Christie's learned the painting was fake between May and December 1986. J. Krahmer Dep. 79.

original sale and even if the subsequent acts of Christie's were designed to prevent the Krahmers from realizing that they purchased a forged painting, the statute of limitations would still bar the petitioners' claim.

A statute of limitations is calculated from the time of the wrongful act "even if the plaintiff is ignorant of the cause of action."[29] Here, the Krahmers' cause of action accrued on December 5, 1986, when they purchased *Interior*. It was on that date that Christie's allegedly injured the Krahmers by misrepresenting the authenticity of the painting.[30] Thus, the general three-year statute of limitations found in 10 *Del. C.* § 8106 expired on December 5, 1989.

Under the doctrines of fraudulent concealment, inherently unknowable injury, or equitable tolling, the statute of limitations governing a cause of action can be tolled to allow an otherwise time-barred action to proceed.[31] Having lost their argument advocating the inherently unknowable injury tolling in the prior ruling of this court,[32] the Krahmers now invoke the doctrine of fraudulent concealment in an attempt to salvage their claim.

To prevail on fraudulent concealment under Delaware law, a plaintiff must prove that the defendant "knowingly acted to prevent [the] plaintiff from learning facts or otherwise made misrepresentations intended to 'put the plaintiff off the trail of inquiry.' "[33] Mere silence is insufficient to establish fraudulent concealment.

Rather, the evidence must show that the defendant engaged in some sort of "actual artifice" to toll the running of the limitations period.[34] Moreover, even when fraudulent concealment exists, "the statute is suspended only until [the plaintiff's] rights are discovered or until they could have been discovered by the exercise of reasonable diligence."[35]

The Krahmers identify two acts by Christie's following the auction which they say form the basis for a reasonable inference that Christie's acted to put them "off the trail of inquiry" as to *Interior's* lack of authenticity. The Krahmers point to Cantor's congratulatory reaction to their purchase, his immediate offer to provide an insurance appraisal, and his conveyance of the nameplate following the sale. The Krahmers claim that Cantor's story about the removal of the nameplate was maliciously concocted and that the offer of an insurance appraisal was highly extraordinary and therefore suspicious. Additionally, the Krahmers argue that Cantor's 1990 appraisal at their residence was an overt effort by Christie's to lull them into a false sense of security regarding the painting's *bona fides*.

Despite the Krahmers' contentions, this court cannot reasonably infer that these acts constitute fraudulent concealment. First, the Detroit Club's written records support Cantor's assertion that the nameplate was removed to prevent any embarrassment to the Club in connection with the sale of art to fund capital improvements. With regard to

29. *SmithKline Beecham Pharms. v. Merck & Co.*, 766 A.2d 442, 450 (Del.2000).

30. *Krahmer*, 903 A.2d at 778.

31. *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, *7 (Del.Ch. Jan.24, 2005).

32. *Krahmer*, 903 A.2d at 783.

33. *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 531 (Del.Ch.2005) (quoting *Halpern v. Barran*, 313 A.2d 139, 143 (Del.Ch.1973)).

34. *Truitt v. Beebe Hosp.*, 514 A.2d 1128, 1131 (Del.Super.1986).

35. *Pettinaro*, 870 A.2d at 531 (citing *Shockley v. Dyer*, 456 A.2d 798, 799 (Del.1983)).

Cantor's congratulations and his offer for an insurance appraisal, these acts, when reasonably viewed in light of the established record, infer and convey nothing more than customer-oriented business practices by Christie's. It is hardly extraordinary for a seller to congratulate a buyer on a purchase or to offer to provide proof of the price paid for an item. And given the fact that collectors of art tend to buy more items in the future, customer service is undoubtedly a factor in ensuring repeat business. These facts, alone or together, could not create a triable issue of fact as to fraudulent concealment.

■ Cantor's 1990 trip to the Krahmers' home, during which he appraised *all* of the Krahmers' artwork including *Interior* at no charge, also fails to support an inference of an intention to fraudulently conceal some earlier misrepresentation. To begin with, the visit came after the end of the three-year limitations period. More importantly, there is nothing about Cantor's visit that is suggestive of anything more than a desire to foster continued good relations with valued customers.

■ Even assuming *arguendo* that Cantor's delivery of the nameplate or Christie's 1990 appraisal constituted an act of fraudulent concealment, the Krahmers' claim is still time barred. At the very latest, the Krahmers were on notice in late 1999 that their painting might be a forgery. A reasonably diligent person, upon learning the existence of a strikingly similar work of art hanging in a Connecticut museum, would have investigated his painting's *bona fides* immediately

thereafter. Instead, the Krahmers took no substantive action until 2002, when they attempted to consign the painting to Sotheby's. Therefore, the Krahmers' 2004 petition was filed well beyond the three-year period mandated by 10 *Del. C.* § 8106.

As this court previously noted, a prudent purchaser of valuable art can readily safeguard his investment by verifying its authenticity with an independent third-party appraisal. Such prudence is especially advisable when art is purchased at auction. The sale price at auction inherently reflects a greater risk of inauthenticity than if the buyer purchased the work directly from the artist or from a gallery representing an artist.[36] Truly, had they exercised "reasonable due diligence, the Krahmers could have discovered that the painting might not be a genuine work of Benson well within the limitations period and certainly within the six-year warranty period. They failed to do so and now ask Christie's to produce evidence and refresh its memory as to the sale of the painting that took place over 18 years ago."[37] This is precisely the type of case which the statute of limitations, considering its underlying objective of fairness, seeks to prevent.[38]

## V.

For the foregoing reasons, the respondent's motion for summary judgment is GRANTED. IT IS SO ORDERED.

---

**36.** *Krahmer,* 903 A.2d at 781 (discussing economics and due diligence in art market).

**37.** *Id.* at 782.

**38.** *See, e.g., Began v. Dixon,* 547 A.2d 620, 623 (Del.Super.1988) ("If all parties were allowed to toll the statute until they learned the legal theory of a proposed action or so pursued an action, there would be no purpose to the statute of limitations."); *Rudginski v. Pullella,* 378 A.2d 646, 649 (Del.Super.1977) (explaining that the statute seeks certainty and fairness by preventing stale claims against a defendant).