IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LGM HOLDINGS, LLC and LGM SUBSIDIARY HOLDINGS, LLC, | § § § § § § § § § § § § § § § | No. 314, 2024<br><br>Court Below: Superior Court of the State of Delaware<br><br>C.A. No. N23C-09-011 |
| Plaintiffs Below, Appellants, | | |
| v. | | |
| GIDEON SCHURDER, MENDY SCHURDER, LEAH CHITRIK, and IBS PHARMA, INC. | | |
| Defendants Below, Appellees. | | |

Submitted: January 29, 2025
Decided: April 22, 2025

Before **VALIHURA**, **TRAYNOR**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court. **REVERSED AND REMANDED.**

Thomas E. Hanson, Jr., Esquire, BARNES & THORNBURG LLP, Wilmington, Delaware; Eric H. Sussman, Esquire (*argued*), BARNES & THORNBURG LLP, Chicago, Illinois *for Appellants LGM Holdings, LLC and LGM Subsidiary Holdings, LLC*.

Travis S. Hunter, Esquire, Gabriela Z. Monasterio, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael J. Payne, Esquire (*argued*), FRANKEL, RUBIN, KLEIN, PAYNE & PUDLOWSKI, P.C., St. Louis, Missouri *for Appellee Gideon Schurder*.

John M. Seaman, Esquire (*argued*), Florentina D. Field, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware *for Appellees Mendy Schurder, Leah Chitrik, and IBS Pharma, Inc. (collectively, the "IBS Sellers")*.

**TRAYNOR**, Justice:

The buyers of a pharmaceutical business appeal the Superior Court's dismissal of their fraudulent-inducement and indemnification claims against the sellers. In short, the trial court determined that that the buyers had waived their fraudulent-inducement claims and that the indemnification claim was time-barred.

The court's waiver determination was based on its interpretation of a letter agreement between the parties, which was executed several years after the buyers' acquisition of the business and in the wake of governmental proceedings involving FDA and Department of Justice investigations of the acquired business. According to the sellers, the purpose of the letter agreement was to preclude further litigation between the parties, including claims of the kind the buyers made in this case. The buyers, on the other hand, understood the letter agreement not as waiving their fraud claims but as simply limiting the size and scope of claims for the recovery of losses attributable to the governmental proceedings. The Superior Court agreed with the sellers and, in consequence, dismissed the buyers' fraudulent-inducement claims. We hold that the buyers' interpretation of the letter agreement is reasonable, as is the sellers' and the trial court's. Put another way, we find that the relevant provision of the letter agreement is ambiguous and that it was therefore inappropriate for the court to dismiss the buyers' fraudulent-inducement claim. We conclude, too, that the buyers adequately pleaded that the sellers had fraudulently concealed the facts

2

giving rise to the buyers' indemnification claim such that the otherwise applicable survival period for bringing the claim was tolled. Because it is reasonably conceivable that the buyers' indemnification claim was timely filed, the court erred in dismissing it. Consequently, and as more fully explained below, we reverse the Superior Court's judgment and remand for further proceedings.

I

A

Gideon Schurder, Mendy Schurder, Leah Chitrik, and IBS Pharma, Inc. ("IBS") (collectively, the "Sellers") owned three pharmaceutical companies (the "Target Companies").[1] The Target Companies, one of which was LGM Pharma, LLC ("LGM"), sourced and distributed active pharmaceutical ingredients ("API") from manufacturers and suppliers around the world.

On September 19, 2017, LGM Holdings, LLC and LGM Subsidiary Holdings, LLC (collectively, the "Buyers") entered into an agreement with the Sellers to acquire the Target Companies (the "Purchase Agreement"). Specifically, the Buyers agreed to purchase shares in the Target Companies in exchange for $23.4 million in cash, an interest in LGM Holdings, LLC valued at $6.6 million, and two unsecured

---

[1] Because Appellees Gideon Schurder and Mendy Schurder share a surname, this opinion refers to them by their first names for the sake of clarity. No disrespect or familiarity is intended.

$2.5 million promissory notes to Gideon and IBS. Hence, the total value of the acquisition was approximately $35 million.

In Article IV of Purchase Agreement, the Sellers made numerous representations and warranties to the Buyers. Three of those representations and warranties are relevant here. In Section 4.20, the Sellers represented that the Target Companies and their facilities were in material compliance with applicable laws and had been for the past seven years.[2] In Section 4.21, the Sellers represented that the Target Companies were in material compliance with "all Health Care Laws" and had been for the past five years.[3] And in Section 4.30, the Sellers represented that their representations and disclosures were complete and accurate.[4]

Article XII of the Purchase Agreement contains indemnification provisions. Section 12.1(b)(ii) provides, in pertinent part, that:

> Subject to the limitations set forth herein, the *Selling Parties shall indemnify*, protect, defend and hold and save *the Buyer Parties* harmless, *from and against* the entirety of *any Losses* any of the Buyer Parties may suffer, sustain or become subject to, including in connection with any charges, complaints, actions, suits, proceedings, hearings, investigations, claims, demands, judgments, orders, decrees, stipulations, injunctions, through and after the date of the claim for indemnification, including without limitation any Losses any of *the Buyer Parties may suffer*, sustain, or become subject to, after the end of the applicable Survival Period (if applicable) if a claim is made, specifying the factual basis in reasonable detail before the end of such Survival Period, *resulting from, arising from or out of, or caused by:*

---

[2] App. to Opening Br. at A139.
[3] *Id.* at A140.
[4] *Id.* at A145.

4

(A) *any breach or inaccuracy of any representation or warranty set forth in Article IV of this Agreement . . . .*[5]

Section 12.1(a)(iii) provides a five-year survival period for indemnification claims relating to representations set forth in Section 4.21—the "Health Care Representations."[6] Section 12.1(a)(iii) states:

> All of the representations and warranties that constitute *Health Care Representations shall survive the Closing*, and shall continue in full force and effect until . . . *sixty (60) months thereafter* . . . after which period such representations and warranties shall terminate and have no further force or effect[.][7]

Section 12.3(a) of the Purchase Agreement sets forth the procedure by which the Buyers could seek indemnification from the Sellers. Section 12.3(a), titled "Claims Procedure," states:

> An Indemnified Person shall give prompt written notice (a "**Claim Notice**") to the Indemnifying Person after the Indemnified Person first becomes aware of any event or other facts that has resulted or that might result in any Loss for which the Indemnified Person is entitled to any indemnification under this Agreement . . . .[8]

Finally, Section 12.9, titled "Indemnification as Sole Remedy," provides that "the sole and exclusive remedy" for breaches of representation and warranties of the Purchase Agreement is "the indemnification and reimbursement obligations of the

---

[5] *Id.* at A165 (emphasis added).
[6] *See id.* at A100 (defining "Health Care Representations" as the "representations and warranties set forth in <u>Section 4.21</u>").
[7] *Id.* at A164 (emphasis added).
[8] *Id.* at A166 (emphasis in original).

Parties set forth in [] Article XII."[9]  It clarified, however, that "Section 12.9 shall not [] prevent or limit a cause of action [] hereunder with respect to fraud, bad faith or intentional misrepresentation . . . ."[10]

The acquisition closed on November 15, 2017.  Following the acquisition, Gideon took on the role of LGM's Commercial Director and Mendy took on the role of LGM's Chief Operating Officer.

B

On September 17, 2018, less than one year after the parties entered into the Purchase Agreement, the United States Food and Drug Administration ("FDA") inspected LGM's facility in Erlanger, Kentucky.  During its inspection, the FDA discovered mislabeled shipments of API at LGM's warehouse.[11]  According to the Buyers, during the FDA's investigation, Gideon actively concealed his role in the mislabeling of API by withholding emails from the FDA and producing a false product-investigation log.[12]  The FDA concluded its inspection in December 2018 and issued LGM a Form 483—a form issued when an FDA investigation reveals potential regulatory violations.[13]  In the Form 483, the FDA listed eleven concerns

---

[9] *Id.* at A170.
[10] *Id.*
[11] Specifically, the FDA focused on two shipments of cidofovir that had arrived at LGM's facility falsely labeled as tranexamic acid, which were then improperly relabeled by LGM. *See id.* at A27.
[12] *See id.*
[13] *See generally FDA Form 483 Frequently Asked Questions,* U.S. Food & Drug Administration (Jan. 9, 2020), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-

that had emerged during its inspection of LGM's Kentucky facility, relating primarily to the improper labeling of API, quality control deficiencies, and inadequate internal controls.

The FDA allows recipients of a Form 483 to respond to the concerns raised by the inspection and implement a corrective plan before the FDA takes further action. To facilitate its response, LGM engaged outside counsel from Reed Smith LLP to investigate the relabeling of API shipments. The investigation revealed Gideon's alleged role in the mislabeling of API and his attempts to hinder the FDA's investigation.[14] In light of these discoveries, LGM terminated Gideon. LGM turned the results of its internal investigation over to the FDA in January 2019.

The Form 483, meanwhile, had caught the attention of the United States Department of Justice ("DOJ"). One year later, in January 2020, LGM received a grand jury subpoena from the DOJ Criminal Division requesting information about LGM's purchase, receipt, and distribution of API. The Buyers retained Reed Smith to review and produce tens of thousands of documents in response to the DOJ subpoena. During this process, the Buyers purportedly uncovered numerous instances of misconduct by Gideon and Mendy. Specifically, the Buyers claim to have discovered that "Gideon and Mendy routinely violated health care laws,

---

investigations/inspection-references/fda-form-483-frequently-asked-questions.
[14] Reed Smith determined that Gideon withheld and materially altered relevant documents and lied to the FDA. *See* App. to Opening Br. at A30.

customs restrictions, and regulations in the U.S. and in other jurisdictions" and that "many of these violations took place prior to [the Buyers'] acquisition of the Target Companies."[15] This caused the Buyers to conclude that the representations and warranties that the Sellers made in Sections 4.20, 4.21, and 4.30 of the Purchase Agreement were false.

## C

After learning of Mendy's misconduct, the Buyers removed him from his position at LGM. In July 2020, LGM Holdings, LLC and LGM entered into a confidential letter agreement (the "Letter Agreement") with Gideon, Mendy, and IBS. The Letter Agreement's recitals state that "[Gideon, Mendy, and IBS] and [LGM and LGM Holdings, LLC] desire to set forth certain mutual understandings and agreements in relation to the relative rights and obligations of the Parties in the Purchase Agreement and related transaction documentation in respect to the Governmental Proceedings . . . ."[16] The Letter Agreement defines "Governmental

---

[15] *Id.* at A32. Specifically, the Buyers claim that the Sellers were not in material compliance with all jurisdictions where they operated because the Sellers: "(1) shipped mislabeled API to the U.S., Isreal, and Switzerland, (2) returned API to manufactures with an incorrect product name, (3) registered manufactures with the FDA without their knowledge or consent, (4) registered intermediaries rather than manufacturers, (5) failed to declare full value of API shipments, and (6) purchased API that the manufacturers specifically instructed suppliers should not be sold in the U.S." *Id.* at A32. In their complaint, the Buyers include excerpts from emails sent to and from Gideon and Mendy to demonstrate their roles in this misconduct. *See id.* at A34–55.

[16] *Id.* at A799.

Proceedings" to include the FDA Form 483, DOJ subpoena, and any potential state actions related to either the Form 483 or the DOJ subpoena.[17]

As part of the Letter Agreement, the parties agreed to certain caps on indemnification regarding "Losses attributable" to the Governmental Proceedings. Section 4(a) of the Letter Agreement, which is at the center of the parties' dispute, reads as follows:

> **4.** **Indemnification.** Notwithstanding anything to the contrary set forth in the Purchase Agreement (including, without limitation, Article XII of the Purchase Agreement):
>
> (a) in the event Parent, Subsidiary Holdings, LGM (or one of its Affiliates (other than the Sellers)) *elects to seek indemnification from the Sellers pursuant to Article XII of the Purchase Agreement in respect of Losses attributable to (y) one or more of the Governmental Proceedings* or (z) any matter set forth on Schedule 12.1(b) of the Purchase Agreement, LGM agrees that it and any other Buyer Party that seeks indemnification thereunder shall be subject to an aggregate indemnification cap of Six Million Dollars ($6,000,000); *provided*, that, in the case of (y), LGM agrees, and shall cause each Buyer Party to, seek indemnification therefor solely pursuant to Section 12.1(b)(ii)(A) of the Purchase Agreement in respect of a breach of one or more Health Care Representations (i.e., applying an aggregate cap of Six Million Dollars ($6,000,000) as set forth in Section 12.2(a)(iii)); provided; further, that, in respect of (y) and (z) above, the Basket shall not apply. *For the avoidance of doubt, the above $6,000,000 cap will apply to any and all claims made by the aforementioned regarding (y) and/or (z) above, and no claim with respect to (y) or (z) above shall include a claim regarding fraud, intentional misrepresentation, or willful misconduct of the Selling Parties.*[18]

---

[17] *Id.*

[18] *Id.* at A803–04 (emphasis added).

## D

On November 8, 2022, the Buyers sent the Sellers a claim notice in accordance with Section 12.3(a) of the Purchase Agreement.[19] The claim notice stated that the Buyers had incurred more than $6 million in fees as a result of the Governmental Proceedings stemming from the Sellers' illegal conduct. As a result, the Buyers sought indemnification for legal and investigatory fees attributable to the Sellers' breaches of the representations and warranties in Article IV of the Purchase Agreement. The claim notice also informed the Sellers that the Buyers believed they have "a claim for fraud, intentional misrepresentation, and/or willful misconduct" against the Sellers.[20]

Several weeks later, the Sellers responded to and rejected the Buyers' claim notice.[21] In their response, the Sellers stated that the Buyers "are attempting to circumvent their undertakings (and the parties' clear mutual understandings) under the Letter Agreement by asserting claims and allegations they specifically waived and/or agreed not to assert pursuant to the Letter Agreement . . . ."[22] In brief, the Seller's denied the Buyers' claim for indemnification and insisted that any potential claims for fraud were waived under Section 4(a) of the Letter Agreement.

---

[19] *See id.* at A913–18.
[20] *Id.* at A917.
[21] *See id.* at A920–21.
[22] *Id.* at A920.

In January 2023, LGM and its senior executives entered into a Consent Decree of Permanent Injunction with the DOJ Civil Division and the FDA.[23] Among other things, the Consent Decree required LGM to retain an independent expert to monitor LGM and its compliance with the Consent Decree for the next four years.

E

On September 1, 2023, the Buyers filed a complaint in the Superior Court against the Sellers for fraudulent inducement and indemnification. The Buyers' complaint contained four counts that are relevant to this appeal.[24] Counts I, II, and III are all claims for fraudulent inducement under Sections 4.20, 4.21, and 4.30, respectively, of the Purchase Agreement. In those counts, the Buyers allege that the representations and warranties that the Sellers made in those sections were false at the time of the acquisition and that, had the Buyers had known that, they would not have purchased the Target Companies.[25] As a remedy for fraudulent inducement, the Buyers requested that the court enter judgment in their favor and against the Sellers in excess of $35 million.[26]

---

[23] It is unclear from the record as we have it what, if anything, happened as a result of the DOJ's criminal investigation.

[24] The Buyers' complaint originally contained five counts. Count V of the complaint, which sought declaratory relief, was voluntarily dismissed by the Buyers after the Sellers filed their motions to dismiss.

[25] See App. to Opening Br. at A58, A61, A62.

[26] See id. at A58, A61, A62–63. The Buyers also sought an award of compensatory and punitive damages, recovery for fraud, attorney fees and costs to prosecute this matter, and consequential

In Count IV of their complaint, the Buyers sought indemnification in accordance with Section 12.1(b)(ii) of the Purchase Agreement for legal and investigatory fees they incurred attributable to the Sellers' breaches of the representations and warranties of Section 4.21 of the Purchase Agreement. The Buyers claimed that they gave timely notice to the Sellers on November 8, 2022, as required by the procedures set forth in Section 12.3 of the Purchase Agreement and sought at least $6 million—the indemnification cap—from the Sellers to cover the fees attributable to the Section 4.21 breaches.[27]

Mendy, Chitrik, and IBS jointly moved to dismiss the Buyers' complaint in November 2023, and Gideon later moved separately to dismiss in December 2023. Both motions were based on the contention that the Buyers had waived their fraud claims in Section 4(a) of the Letter Agreement because those claims related to the Governmental Proceedings and that the Buyers indemnification claim was time-barred.[28]

In response to the motions, the Buyers argued that "[t]he Letter Agreement simply set certain caps and narrowed the scope for indemnification regarding

damages in the amount to be determined at trial, together, with other relief as the court deems appropriate and just. *See id.* at A58–59, A61, A63.

[27] The Buyers also sought an award of all damages permissible under the Purchase Agreement and Letter Agreement, attorney fees and costs, and an award of consequential damages in an amount to be determined at trial, together, with other relief as the court deems appropriate and just. *Id.* at A65.

[28] *See LGM Hldgs., LLC v. Schurder*, 2024 WL 3372509, at *4 (Del. Super. Ct. July 10, 2024) [hereinafter "Opinion"].

12

'Losses attributable' to Governmental Proceedings" and that the Buyers "never gave up the right to pursue fraud claims against [the] Sellers that were unrelated to 'Losses attributable' to Governmental Proceedings."[29] The Buyers also argued that their indemnification claim was not time-barred because the Sellers' concealment of their fraud tolled the five-year survival period established by the Purchase Agreement. Consequently, according to the Buyers, the five-year survival period did not begin until 2020, making their September 2023 complaint timely.

The Superior Court granted the Sellers' motions, dismissing Counts I through IV with prejudice.[30] The Superior Court's dismissal rests upon two critical determinations, both of which the Buyers challenge on appeal. First, in dismissing Counts I, II, and III, the court rejected the Buyers' argument that Section 4(a) only waives claims regarding "Losses attributable" to the Governmental Proceedings. Instead, the court found that, because the phrase "Losses attributable" was not included in the last sentence of Section 4(a), the Letter Agreement broadly waived all fraud claims relating to the Governmental Proceedings—not just fraud claims for "Losses attributable" to the Governmental Proceedings.[31] And, according to the court, because "there [wa]s sufficient overlap" between the Sellers' actions implicated in the fraudulent inducement claims and the Governmental Proceedings,

---

[29] App. to Opening Br. at A939.
[30] *See* Opinion at *1.
[31] *Id.* at *5 n.72.

13

the fraudulent inducement claims were related to the Governmental Proceedings and were waived under the Letter Agreement.[32]

Second, in dismissing Count IV, the court concluded that the Buyers' indemnification claim was untimely because it was filed more than 60 months after the closing of the acquisition and was therefore time-barred under Section 12.1(a)(iii) of the Purchase Agreement. The court reasoned that "the Purchase Agreement's plain language required the Buyers to file suit for indemnity claims related to the Health Care Representations by November 15, 2022"—60 months after the acquisition closed—and the Buyers failed to file suit until September 2023.[33] The court rejected the Buyers' argument that the Purchase Agreement's five-year survival period was tolled under the doctrine of fraudulent concealment and equitable estoppel. Relying on *Pilot Air Freight, LLC v. Manna Freight Systems, Inc.*,[34] the court found that the doctrine of fraudulent concealment did not toll the survival period because the Buyers were "indisputably on inquiry notice of the [Sellers'] alleged breach[es] well within the limitations period."[35]

---

[32] *Id.* at *6.
[33] *Id.* at *8.
[34] 2020 WL 5588671 (Del. Ch. Sept. 18, 2020).
[35] Opinion at *8 (quoting *Pilot Air*, 2020 WL 5588671, at *15) (brackets added).

## II

We review questions of contract interpretation *de novo*.[36] Whether a claim is time-barred is also a question of law that we review *de* novo.[37] Likewise, we review the Superior Court's grant of a motion to dismiss under Rule 12(b)(6) *de novo*.[38] When considering a motion under Rule 12(b)(6), we view the complaint "in the light most favorable to the non-moving party"[39] and accept as true "all well-pled allegations and the reasonable inferences flowing from those allegations . . . ."[40] The Superior Court's "grant of a motion to dismiss is only appropriate when the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[41] We will not "credit conclusory allegations that are unsupported by specific facts or draw unreasonable inferences in the plaintiff's favor."[42]

---

[36] *See Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014).

[37] *See Lehman Bros. Hldgs., Inc. v. Kee*, 268 A.3d 178, 185 (Del. 2021).

[38] *See Ramirez v. Murdick*, 948 A.2d 395, 399 (Del. 2008).

[39] *Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021) (quoting *Clinton v. Enterprise Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[40] *Id.* (citing *Clinton*, 977 A.2d at 895).

[41] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871–72 (Del. 2020) (quoting *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[42] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 100 (Del. 2013).

## III

We are confronted with two issues in this appeal. First, we must determine whether, when the Buyers entered into the Letter Agreement, they unambiguously waived their right to bring claims for fraudulent inducement as stated in Counts I, II, and III of the complaint. Next, we must consider whether Count IV of the complaint, which seeks indemnification for fees attributable to the Sellers' breaches of Section 4.21 of the Purchase Agreement, is time-barred because the Buyers failed to bring it within the applicable survival period under Section 12.1(a)(iii). We address each of these issues in turn.

## A

When a motion to dismiss hinges on the interpretation of a contract, a trial court may only grant the motion if the defendants' interpretation of the contract is "the *only* reasonable construction as a matter of law."[43] When interpreting a contract on a motion to dismiss, "the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions."[44] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[45] An interpretation of a contract is considered unreasonable "if it produces an absurd result or a result that

---

[43] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (emphasis in original).

[44] *Id.*

[45] *Terrell v. Kiromic Biopharma, Inc.*, --- A.3d ---, 2025 WL 249073, at *3 (Del. Jan. 21, 2025) (quoting *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)).

16

no reasonable person would have accepted when entering the contract."[46]  Even if the court considers one party's interpretation of a contract to be more reasonable, it is error for the court, on a Rule 12(b)(6) motion, "to select the 'more reasonable' interpretation as legally controlling."[47]

Not surprisingly, the Buyers and Sellers each proffer competing interpretations of Section 4(a) and how it affects the Buyers' rights to bring fraud claims under the Purchase Agreement.  The Buyers, on the one hand, argue that they did not waive claims for fraudulent inducement when they signed the Letter Agreement because Section 4(a) only relates to claims for "Losses attributable" to Governmental Proceedings.  According to the Buyers, Section 4(a) of the Letter Agreement "was designed to outline how indemnification claims relating to 'Losses attributable' to Governmental Proceedings should be handled." [48]  Under this interpretation, the last sentence of Section 4(a) does not bar *all fraud claims that relate* to the Governmental Proceedings, but *only fraud claims seeking damages for losses attributable* to the Governmental Proceedings.  The Buyers argue that, because their fraudulent inducement claims concern the Sellers' pre-closing activity,

---

[46] *Id.* (quoting *Manti Hldgs.*, 261 A.3d at 1208).  *See also Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[47] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1292 (Del. 2007) (citing *Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/KMB Managers, Inc.*, 961 A.2d 609 (Del. 1996)).

[48] Reply Br. at 5.

17

their fraudulent inducement claims are unrelated to the losses attributable to the Governmental Proceedings.

For their part, the Sellers argue that the Buyers waived their right to bring all fraud claims related to the Governmental Proceedings and that, since the fraudulent inducement allegations are interwoven with the Governmental Proceedings, those claims are waived. According to the Sellers, the last sentence of Section 4(a) constitutes a broad waiver of all fraud claims "with respect to" the Governmental Proceedings, emphasizing the absence of the phrase "Losses attributable to" in the last sentence. And because the Buyers' fraud claims are "with respect to" the Governmental Proceedings, the Sellers contend that the Buyers waived the claims alleged under Counts I, II, and III when they entered into the Letter Agreement.

As mentioned above, the Superior Court rejected the Buyers' argument that Section 4(a) only waived fraud claims with respect to losses attributable to the Governmental Proceedings, holding that Section 4(a) constitutes a broad waiver of fraud claims relating to the Governmental Proceedings rather than a narrow waiver relating only to "Losses attributable" to the proceedings.[49] We agree that this represents a reasonable interpretation of the Letter Agreement. But it is not the only reasonable interpretation.

---

[49] *See* Opinion at *5 n.72.

18

In our view, the Buyers have proffered another reasonable interpretation of Section 4(a), under which Section 4(a) only waived fraud claims with respect to losses attributable to the Governmental Proceedings. The first sentence of Section 4(a) addresses situations where the Buyers may seek indemnification for "Losses attributable to (y) one or more of the Governmental Proceedings . . ." and goes on to limit indemnification for these losses to an aggregate cap of $6 million.[50] The last sentence of Section 4(a) states, "For the avoidance of doubt, . . . no claim with respect to (y) . . . shall include a claim regarding fraud, intentional misrepresentation, or willful misconduct of the Selling Parties," where "(y)" is defined as "one or more Governmental Proceedings."[51] The Sellers argue, and the Superior Court concluded, that because (y) is defined to mean Governmental Proceedings and not losses attributable to Governmental Proceedings that this last sentence constitutes a broad waiver.

It is reasonable to conclude, however, that the last sentence was drafted to clarify—"for the avoidance of doubt"—that any losses attributable to the Governmental Proceedings must be recovered though an indemnification claim for breach of the Health Care Representations. In other words, the last sentence could reasonably be interpreted to mean that the Buyers would not be able to circumvent

---

[50] App. to Opening Br. at A803–04.
[51] Id.

19

the $6 million indemnification cap for losses attributable for Governmental Proceedings by disguising an indemnification claim as a separate action for fraud, intentional misrepresentation, or willful conduct. Furthermore, a reasonable interpretation of the clause "[f]or the avoidance of doubt"[52] is that it seeks to reiterate the limited scope of the indemnification claim set forth earlier in the section, which concerns losses attributable to Governmental Proceedings.[53]

Because the Letter Agreement is subject to more than one reasonable interpretation, we find that the language of Section 4(a)—and, in particular, the last sentence—is ambiguous.[54] At the motion to dismiss stage, a trial court cannot

---

[52] The IBS Sellers contend that because the "Buyers did not make this argument about 'For the avoidance of doubt' in the Superior Court, the court did not have the chance to consider it, and the argument is waived." IBS Sellers' Answering Br. at 25. We reject this assertion. The Buyers have consistently argued that Section 4(a) only related to "Losses attributable" to Governmental Proceedings. Highlighting the phrase "For the avoidance of doubt," does not raise a new argument or theory, but rather an additional reason to support the Buyers steadfast argument that Section 4(a) only applies to "Losses attributable" to Governmental Proceedings. *See Mundy v. Holden*, 204 A.2d 83, 87 (Del. 1964) (quoting *Kerbs v. Cal. E. Airways, Inc.*, 90 A.2d 652, 659 (Del. 1952)) ("We will not permit a litigant to raise in this court for the first time matters not argued below where to do so would be to raise an entirely new theory of his case, but when the argument is merely an additional reason in support of a proposition urged below, there is no acceptable reason why in the interest of a speedy end to litigation the argument should not be considered.").

[53] *See White v. Curo Tex. Hldgs., LLC*, 2016 WL 6091692, at *21 (Del. Ch. Sept. 9, 2016) ("The second part of the parenthetical phrase seeks to clarify the first by stating 'but for the avoidance of doubt . . . .'").

[54] The Sellers argue that the Buyers waived any argument relating to ambiguity by failing to raise it in the Superior Court. First, the Buyers did not waive this argument. *See* App. to Opening Br. at A937 (quoting *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *14 (Del. Ch. Feb. 24, 2020)) (". . . if there is more than one 'reasonable construction' of contractual language, then the contract is ambiguous, and a defendant's motions to dismiss cannot be granted."). Even so, the Buyers' alleged failure to raise ambiguity below does not preclude this Court from determining that contractual language at issue on appeal is ambiguous when both parties present reasonable interpretations of that contractual language.

choose between two reasonable interpretations of an ambiguous contract.[55] A motion to dismiss can only be granted when the moving party's interpretation is the *only* reasonable interpretation.[56] Consequently, the court erred in granting the Sellers' motions to dismiss as to Counts I, II, and III.

We turn next to the Superior Court's conclusion that Count IV of the complaint is time-barred.

B

Both the Buyers and the Sellers agree that the applicable survival period for the Buyers' indemnification claim is five-years, as established in Section 12.1(a)(iii) of the Purchase Agreement. The parties disagree, however, as to when that five-year survival period commenced. According to the Buyers, the five-year survival period was tolled because the Sellers willfully concealed their false and misleading statements and unlawful business practices from the Buyers. Invoking the doctrine of fraudulent concealment, the Buyers contend that the five-year survival period was tolled until they were on inquiry notice of their claim; this, the Buyers admit, they had in the summer of 2020 when Reed Smith concluded its internal investigations. Therefore, according to the Buyers, they had until the summer of 2025 to file their indemnification claim.

---

[55] *See supra* pp. 16–17.
[56] *See id.*

21

The Sellers, on the other hand, contend that the survival period began to run on November 15, 2017, when the acquisition closed and was not tolled because the Buyers were on notice of their indemnification claim well within the five-year survival period, which ended in November 2022. Additionally, the Sellers argue that the Buyers' complaint failed to sufficiently plead fraudulent concealment.[57]

Under the doctrine of fraudulent concealment, a statute of limitations—or in this case a survival period[58]—can be "disregarded when a defendant has fraudulently concealed from a plaintiff the facts necessary to put [the plaintiff] on notice of the truth."[59] "Under this doctrine, a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[60] Where a plaintiff has proved that the defendant fraudulently concealed facts necessary to put the plaintiff on notice, the statute of limitations or survival period governing a claim will be

[57] *See* IBS Sellers' Answering Br. at 42–43; Gideon's Answering Br. at 36–37.

[58] In their briefs, the Sellers question whether the doctrine of fraudulent concealment applies to survival periods created by contract in the same way that it applies to limitations created by statute. *See* IBS Sellers' Answering Br. at 39; Gideon's Answering Br. at 37. Delaware courts have held, however, that survival periods created by contract are not immune from tolling under the doctrine of fraudulent concealment. *See Wind Point P'rs VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *8 (Del. Super. Ct. Aug. 17, 2020) (finding that a contractual "Survival Clause does not foreclose a tolling analysis.")*; AssuredPartners of Va., LLC v. Sheehan*, 2020 WL 2789706, at *13 (Del. Super. Ct. May 29, 2020) (finding that a contractual limitations period "may be tolled by Defendant's alleged fraudulent concealment, which Plaintiff adequately pleads."). Furthermore, in *Pilot Air*, a case upon which the Sellers heavily rely, the Court of Chancery applied the doctrine of fraudulent concealment to a contractual survival period. *See Pilot Air*, 2020 WL 5588671, at *15.

[59] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

[60] *Id.* (citing *Ewing v. Beck*, 520 A.2d 653, 667 (Del. 1987)).

tolled.[61]  Tolling suspends or stops the running of a limitations period—"it is analogous to a clock stopping and then restarting."[62]  "The rationale for this doctrine is to disallow a defendant from taking advantage of his own wrong in preventing a plaintiff from [filing] a timely suit in the courts."[63]

Fraudulent concealment does not, however, toll a statute of limitations or survival period indefinitely.  Delaware courts have consistently held that the doctrine of fraudulent concealment does not toll a statute of limitations or survival period "beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong."[64]  Put differently, "the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, *i.e.* on inquiry notice."[65]

Here, the Superior Court did not address whether the Buyers had sufficiently pleaded fraudulent concealment nor did it determine when the Buyers were put on inquiry notice.  Instead, the court found that the Buyers had actual notice on July 23, 2020, when they signed the Letter Agreement 32 months after closing.  According

---

[61] *See In re Dean Witter P'ship Litig*., 1998 WL 442456, at *5 (Del. Ch. July 17, 1998); 51 AM. JUR. 2D. *Limitation of Actions* § 164 (Jan. 2025 Update) (Under the doctrine of fraudulent concealment, "a statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence.").

[62] 51 AM. JUR. 2D. *Limitation of Actions* § 150 (Jan. 2025 Update).

[63] *Allen v. Layton*, 235 A.2d 261, 265 (Del. Super. Ct. 1967).

[64] *Tyson Foods*, 919 A.2d at 585 (citing *Dean Witter*, 1998 WL 442456, at *6 ).

[65] *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008) (citing *Dean Witter*, 1998 WL 442456, at *6).

to the court, because the Buyers had actual notice of their indemnification claim "well within" five years after the acquisition—more than two years before the 60-month survival period would expire—the Buyers could not invoke the doctrine of fraudulent concealment to toll the five-year survival period.[66]  In so holding, the court relied exclusively on the Court of Chancery's decision in *Pilot Air*, a case involving a similar contractual survival period to the one at issue here.

In *Pilot Air*, the plaintiff and defendants had signed an asset purchase agreement, which included representations and warranties.[67]  The agreement provided that any claim for indemnification regarding the representations and warranties was to be brought within 15 months of the agreement's closing.[68]  The plaintiff filed an indemnification claim in the Court of Chancery approximately 17 months after closing and argued that "contractual limitations period should be tolled" because the defendants "acted affirmatively to conceal the wrong."[69]  The Court of Chancery rejected this argument, finding that the plaintiff was on inquiry notice the day it took over the defendants' business.  The court explained that, because the plaintiff was immediately on inquiry notice, the doctrine of fraudulent concealment could not extend the contractual survival period beyond the 15 months

---

[66] Opinion at *7.
[67] *Pilot Air,* 2020 WL 5588671, at *1.
[68] *Id.*
[69] *Id.* at *15.

stated in the asset purchase agreement. As the Vice Chancellor put it, "by the time [the plaintiff] took the helm at the Company, [the] ship's alarms had been ringing for months."[70]

The Superior Court did not sufficiently attend to this key fact in *Pilot Air*, focusing instead on the Vice Chancellor's statement that fraudulent concealment could not toll the survival period in *Pilot Air* because the plaintiff was "indisputably on inquiry notice of the alleged breach *well within the limitations period*."[71] The court seems to have taken this to mean that, if a plaintiff is put on inquiry notice within a contractual survival period such that the plaintiff has sufficient time to file a claim, then the doctrine of fraudulent concealment does not extend the survival period beyond what is provided in the agreement. But that is not how the doctrine of fraudulent concealment operates. If the plaintiff successfully proves fraudulent concealment in this context, then the survival period begins on the day the plaintiff was put on inquiry notice of the claim.[72]

Thus, to determine whether the Buyers' indemnification claim is subject to dismissal as time-barred, we must determine whether the Buyers sufficiently alleged that the Sellers affirmatively acted to prevent the Buyers from gaining knowledge of

---

[70] *Id.*

[71] *Id.* (emphasis added).

[72] *See Weiss*, 948 A.2d at 451 (citing *Dean Witter*, 1998 WL 442456, at *6).

facts giving rise to their claim or led the Buyers away from the truth.[73] A defendant's "[m]ere silence is insufficient to establish fraudulent concealment."[74] A defendant's "partial disclosure of facts in a misleading or incomplete way, however, can rise 'to the level of actual artifice.'"[75] The Superior Court did not address this issue below, so we address it now for the first time on appeal.

We are satisfied that Buyers' complaint adequately alleges that the Sellers affirmatively acted to conceal their wrongdoing from the Buyers. The Buyers' complaint alleges that the "Sellers caused significant damage to the Target Companies and [the] Buyers by [the] Sellers' false and misleading business practices, all of which it willfully concealed from [the] Buyer."[76] The Buyers further allege that the Sellers "hid [] information leading up to and after the acquisition" and that it was not until the Buyers retained Reed Smith to conduct their own internal investigations—in response to the FDA and DOJ investigations—that the Buyers discovered that the Sellers had routinely violated federal law in the years leading up to the acquisition.[77]

The Sellers contend that the Buyers' complaint is factually deficient because it lacks any allegations of affirmative acts by the Sellers that prevented the Buyers

---

[73] *See Pilot Air*, 2020 WL 5588671, at *15 (quoting *Tyson Foods*, 919 A.2d at 585).
[74] *AssuredPartners*, 2020 WL 2789706, at *17 (citing *Krahmer v. Christie's Inc.* 911 A.2d 399, 407 (Del. Ch. 2006)).
[75] *Id.* (quoting *Tyson Foods*, 919 A.2d at 588).
[76] App. to Opening Br. at A58, A60, A62.
[77] *Id.* at A16–17.

from learning of facts giving rise to their indemnification claim or led the Buyers away from the truth.[78] We disagree. The Buyers' complaint alleges that the Sellers intentionally made false statements to the Buyers during due diligence relating to LGM's compliance with the law and actively concealed their illegal activity from the Buyers.[79] This allegation is supported by the results of Reed Smith's internal investigations. Furthermore, the Buyers' complaint alleges that Gideon "falsely advised FDA inspectors that he was not aware of the mislabeled shipments" that arrived at LGM's warehouse "despite emails showing that [Gideon] had authorized mislabeling" of one of the shipments.[80] The complaint also alleges that Gideon "knowingly withheld these emails from the FDA in an effort to convince the FDA that LGM did not have prior knowledge of the mislabeling" and that "Gideon supervised the creation of a false product investigation log" to falsely represent to the FDA that LGM has conducted an investigation into the mislabeled shipments.[81] Given these allegations, it is reasonably conceivable that during the due diligence process before the acquisition and again during the FDA's investigation after the acquisition, the Sellers fraudulently concealed facts that would have put the Buyers on inquiry notice of their indemnification claim. It is, of course, for the plaintiffs to

---

[78] *See* IBS Sellers' Answering Br. at 43; Gideon's Answering Br. at 36–37.
[79] *See* App. to Opening Br. at A58.
[80] *Id.* at A27.
[81] *Id.*

muster admissible evidence sufficient to prove these allegations, but that is for another day. All the same, dismissal of the Buyers' indemnification claim at the pleading stage as time-barred was erroneous.

Likewise, the parties are free to litigate the question of inquiry notice. We can say nothing more at this point than, on the pleadings, it is reasonably conceivable that the earliest possible date that the Buyers were on inquiry notice was September 17, 2018—the day the FDA launched its investigation of LGM's Kentucky facility. If that date holds, the indemnification claim would be timely because it was filed less than five years later on September 1, 2023. We recognize that discovery and fact-finding could prove otherwise.

IV

Accordingly, we reverse the Superior Court's dismissal of the Buyers' complaint and remand for further proceedings consistent with this opinion. Jurisdiction is not retained.